WOODDALE BUILDERS,
INC., Appellant,

v.

MARYLAND CASUALTY COMPANY,
d/b/a Zurich North America, defendant and third party plaintiff, Appellant,

v.

American Family Insurance, third party defendant, Appellant,

Western National Insurance Group, third party defendant, Appellant,

West Bend Mutual Insurance Company, third party defendant, Respondent,

SafeCo., third party defendant, Respondent.

Nos. A04–1442, A04–1612.

Supreme Court of Minnesota.

Oct. 5, 2006.

James T. Martin, Julian C. Janes, Gislason, Martin & Varpness, P.A., Edina, MN, for Appellant Western Nat'l.

Ernest F. Peake, Chad A. Kelsch, Leonard, O'Brien, Spencer, Gale & Sayre, Ltd., Minneapolis, MN, for Appellant Wood–Dale Builders.

David Oskie, James M. Hamilton, Oskie, Reuter, Hamilton, Sofio & Zentner, P.A., St. Paul, MN, for Appellant American Family Ins. Group.

Andrea E. Reisbord, Peter G. VanBergen, Cousineau, McGuire & Anderson, Chartered, Minneapolis, MN, for Appellant Mary–Land Casualty Co.

Gregory J. Johnson, Klay C. Ahrens, Johnson, Provo–Petersen, L.L.P., St. Paul, MN, for Respondent West Bend Mutual Ins.

Ted E. Sullivan, William L. Davidson, Lind, Jensen, Sullivan & Peterson, P.A., Minneapolis, MN, for Respondent SafeCo.

Erik F. Hansen, J. Robert Keena, Hellmuth & Johnson, P.L.L.C., Eden Prairie, MN, for Defective Const. Homeowners of MN.

Jocelyn Knoll, Katie Pfeifer, Dorsey & Whitney, L.L.P., Minneapolis, MN, for Builders Ass'n of MN.

Thomas H. Boyd, Christianna L. Finnern, Winthrop & Weinstine, P.A., Minneapolis, MN, for MN Ch. of Commerce.

Alan C. Williams, Assistant Attorney General, St. Paul, MN, for MN Atty. Gen's Office.

## OPINION

ANDERSON, PAUL H., Justice.

This is an appeal in a declaratory judgment action brought by Wooddale Build-

ers, Inc. to establish the obligation of Maryland Casualty Co., one of its commercial general liability (CGL) insurers, to defend and indemnify Wooddale against multiple homeowner claims of defective construction and/or faulty workmanship. The homeowners' claims are the result of water intrusion damage to stucco homes constructed by Wooddale from 1991 to 1999. Between November 1990 and November 2002, five insurers, including Maryland Casualty, provided CGL coverage to Wooddale under occurrence-based insurance policies. After Wooddale commenced its action against Maryland Casualty, Maryland Casualty commenced a third-party action against Wooddale's four other insurers.

The parties brought cross-motions for summary judgment. The Hennepin County District Court determined that there were no genuine issues of material fact and concluded that liability for each claim should be allocated among the insurers "pro rata by time on the risk." The court established "the start date for allocation purposes" as the date of closing of the purchase of each home, and the "end date" for allocation purposes as the date Wooddale was put on notice of each homeowner's claim. The court also concluded that the costs of investigation and defense should be shared equally among the insurers whose policies were triggered by a homeowner's claim.

On appeal, the Minnesota Court of Appeals held that the district court did not err in awarding summary judgment, but reversed the district court, concluding that the appropriate end date for allocation purposes was the date of remediation. The court of appeals also reversed the district court's ruling on defense costs, concluding that costs should be allocated among insurers in the same manner as liability. Wooddale and three of the five

insurers petitioned for review of two issues: (1) the appropriate end date for allocation purposes; and (2) the appropriate apportionment of defense costs. We reverse.

The material facts of this case are not in dispute. Wooddale Builders, Inc. is a general contractor that constructs single-family homes. In late 2000, Wooddale began to receive claims of defective construction and/or faulty workmanship from the owners of stucco homes it had built from 1991 to 1999. Ultimately, Wooddale was notified of claims by sixty different homeowners. The homeowners claimed that defective construction and/or faulty workmanship by Wooddale resulted in water intrusion and mold growth problems in their homes. Multiple sources of water intrusion existed, including leaky windows, inadequate flashing, penetration through building paper, and vents through which wind-driven water entered the home. These sources of water intrusion apparently existed since construction of the homes. The parties agree that damage to the homes was not caused by a solitary, discrete, identifiable event; rather, the damage was caused by repeated water intrusion occurring over an extended period of time, with continual, progressive, and indivisible damage occurring to the homes. The extent of the decay in each individual home was dependent on the frequency, intensity, direction, and duration of rainstorms during construction or after completion. According to one environmental health consultant:

All that one can say with a degree of reasonable scientific certainty is that the mold damage to any given building began at some point during or after construction and that it continued or will continue until such time as the mold colonies are deprived of one or more of

the conditions required for continued growth: food, water and warmth.

The parties agreed—but did not stipulate—that allocation of liability by the pro-rata-by-time-on-the-risk method is appropriate under these circumstances.[1]

Wooddale had continuous commercial general liability (CGL) insurance coverage from five different insurers from November 13, 1990, until November 13, 2002.[2] The insurers provided coverage to Wooddale as follows:

| | |
|---|---|
| American Family | Nov. 1990-Nov.1995 |
| West Bend | Nov. 1995-Nov.1996 |
| SafeCo | Nov. 1996-Nov.1997 |
| Maryland Casualty | Nov. 1997-Nov.2000 |
| Western National | Nov. 2000-Nov.2002 |

After November 13, 2002, Wooddale apparently did not have CGL coverage for water intrusion damage.[3] Each of Wooddale's CGL policies is an occurrence-based policy containing a standard insuring agreement calling upon the insurer to defend and indemnify Wooddale for "sums that [Wooddale] becomes legally obligated to pay [for property damage] to which this insurance applies."

As Wooddale received the homeowners' claims, it began to make some of the repairs and tendered the claims to its insurer(s). The record is unclear whether Wooddale tendered the claims only to Maryland Casualty or to all five insurers, and whether the claims were rejected or simply not acted upon. After some time had elapsed and Wooddale had not been reimbursed in full for the repairs, Wooddale commenced a declaratory action against Maryland Casualty to establish Maryland Casualty's obligation to defend and indemnify Wooddale for the homeowners' claims. Maryland Casualty in turn brought a third-party action against American Family, Western National, West Bend, and SafeCo, seeking "an amount of money equal to each Third–Party Defendants' (sic) share of the total damages awarded to [Wooddale], if any, [pro rata by time on the risk]."

The parties filed cross-motions for summary judgment on the issues of liability and defense costs. The parties agreed that the appropriate method for apportionment of liability among the insurers is pro rata by time on the risk, and that the starting point for the liability allocation period for each claim is the closing date on the purchase of the home. The parties disagreed, however, about the appropriate end date for the liability allocation period as well as the appropriate method by which to allocate defense costs.[4]

1. We have held that the pro-rata-by-time-on-the-risk method applies when damage is continuous and does not arise from a discrete and identifiable event. *In re Silicone Implant Ins. Coverage Litig.,* 667 N.W.2d 405, 421 (Minn.2003).

2. Although it appears that Wooddale received most of the homeowners' claims before the expiration of its last insurance policy providing coverage for water infiltration damage, the district court record does not indicate precisely when Wooddale received notice of some of the sixty claims. It appears that Wooddale received notice of one of the sixty claims on October 2, 2003, nearly eleven months after the expiration of Wooddale's last relevant policy.

3. On appeal, Wooddale asserts that its lack of coverage after November 13, 2002, was due to the lack of availability of coverage for water intrusion damage. The district court record neither supports nor contradicts Wooddale's assertion. The availability of CGL coverage for water intrusion damage after 2002—either to Wooddale specifically or to the home construction industry in general—does not appear to have been considered by the district court.

4. Although the insurers disputed the extent of their obligation to indemnify Wooddale for the homeowner claims, they were involved to varying degrees in the investigation, defense, and settlement of some of the homeowners' claims. Some of the homes were repaired

The district court granted summary judgment. The court applied Minnesota's "actual injury" rule, and concluded that "the damage sustained to these homes was not the result of a discrete and identifiable event, but rather so continuous and indivisible as to make it impossible to identify one such event." The court then concluded that the "appropriate method of allocating damages to the Insurers in this case is pro rata by time on the risk." The court concluded that the start date for allocation purposes should be the closing date on the purchase of each home, and the end date for allocation purposes should be the date that Wooddale was put on notice of that homeowner's claim.[5] Finally, the court concluded that the costs of investigating and defending the homeowners' claims should be borne equally by the insurers whose policies were triggered for each claim.

West Bend appealed to the court of appeals, arguing that the district court erred in setting the end date for allocation purposes as the date Wooddale received notice of a claim and by allocating defense costs equally among the insurers whose policies were triggered. SafeCo also appealed, seeking clarification regarding whether, if a policy is triggered, the entire policy period is considered for allocation purposes.

The court of appeals affirmed the district court's decision to grant summary judgment, but reversed that court's rulings on the end date for allocation purposes and the apportionment of defense costs. *Wooddale Builders, Inc. v. Maryland Cas. Co.*, 695 N.W.2d 399, 407–08 (Minn.App. 2005) (*Wooddale I*). The court of appeals concluded that "the appropriate ending date when allocating liability among consecutive insurers according to the pro-rata-by-time-on-the-risk method is the date of remediation" and that fairness required "that defense costs among consecutively liable insurers should be allocated according to the same method used to apportion indemnity costs." *Id.* at 406–07. The court of appeals dismissed SafeCo's policy period appeal, concluding that the issue SafeCo sought to have reviewed had not been properly presented to the district court. *Id.* at 407.

Maryland Casualty and Western National sought review of the court of appeals' rulings on both the end date for allocation purposes and the allocation of defense costs. American Family sought review of the allocation of defense costs. Wooddale also sought review, requesting clarification of whether the court of appeals' ruling on the end date for allocation purposes means that Wooddale is potentially liable for the continuing damages occurring between the date on which the last triggered policy expired and the end of remediation. The Minnesota Attorney General, the Builders

---

before Wooddale's last CGL policy expired in 2002. By the conclusion of Wooddale's declaratory action in the district court, some of the homeowners' claims had been investigated but not yet repaired, while others had not yet been investigated. Of the homes that had been repaired, some of the claims had been settled between Wooddale and its insurers and other claims remained in dispute. Even the claims that have been settled between Wooddale and the insurers are still disputed among the five insurers.

5. Under the district court order, each homeowner's claim requires an individual calculation of the liability of each insurer. For example, if the closing on the purchase of a particular home occurred in 1991, and Wooddale was notified of the homeowner's claim in early 2002, each policy of each of the five insurers would be triggered. But if the closing on the purchase of a home occurred in December 1999 and Wooddale received notice of the claim in January 2001, only two policies would be triggered: the fifth Maryland Casualty policy (1999–2000) and the first Western National (2000–2001) policy.

Association of Minnesota, the Defective Construction Homeowners of Minnesota, and the Minnesota Chamber of Commerce requested leave to participate as amici curiae. Amicus Defective Construction Homeowners of Minnesota argues that the completion of the home "constitutes a discrete originating event sufficient to trigger insurance coverage" and that therefore allocation among consecutive insurers is inappropriate.

All petitioners and amici argued that the court of appeals misapplied general policies and principles of insurance law to the district court order, which resulted in an erroneous reversal of all or part of that court's order. We granted the four petitions for review and the four amici requests. No party requested review of the propriety of the application of the pro-rata-by-time-on-the-risk method.[6]

## I.

The ultimate issue the parties ask us to resolve is the proper allocation of damages, both among individual insurers and among the insurers and Wooddale. As noted above, the claims made against Wooddale fall into three categories. In some cases, Wooddale received notice of the claim and completed remediation, all before the expiration of the last of its applicable insurance policies in November 2002. In other cases, Wooddale received notice of the claim, but had not completed remediation, before the expiration of the last of its applicable policies in November 2002. Finally, in at least one case, Wooddale did not receive notice of the claim, much less complete remediation, before its

last applicable policy expired in November 2002.

In addressing the allocation of damages, the parties have focused their inquiry in this appeal on the appropriate end date for allocation of liability. But as our analysis will demonstrate, the parties' allocation of damages question requires us to address several related issues. These issues include (1) each insurer's time on the risk, (2) the total period over which liability is to be allocated, and (3) the total damages to be allocated. The relationship between these issues, and therefore the allocation of damages among the individual insurers and Wooddale, can be expressed—and perhaps best understood—in terms of a simple equation: $\frac{A}{B} \times C = D$. In this equation, A is each insurer's time on the risk, B is the total period over which liability is allocated, C is the total damages to be allocated, and D is the damages allocated to each individual insurer. Keeping this equation in mind, we shall address in turn each issue/factor of the equation, mindful of each issue/factor's effect on the overall result.

*Each Insurer's Time on the Risk (Factor A)*

We begin our analysis by addressing each insurer's time on the risk (factor A). This part of our analysis requires us to determine two things: (1) which insurers are obligated to indemnify Wooddale with respect to a particular claim and therefore are on the risk; and (2) whether the insurers on the risk are deemed to be on the risk for all or only part of each triggered policy.

**6.** Arguably, the damage to the homes is traceable to a discrete and identifiable event, such as installation of the windows, installation of the flashing, or the application of the building paper. Nevertheless, for purposes of this opinion, the applicability of the pro-rata-by- time-on-the-risk method is the law of the case. Accordingly, the issue whether the pro-rata-by-time-on-the-risk method is generally applicable to water intrusion damage cases is not before us.

### 1. Which Insurers Are On the Risk for a Particular Claim

As previously noted, each of Wooddale's relevant insurance policies is an occurrence-based CGL policy calling on the insurer to indemnify Wooddale for sums Wooddale is legally obligated to pay due to property damage resulting from an occurrence to which the insurance applies. Occurrence-based CGL coverage is based on standard form insurance policies and in this case, applies when "property damage" occurs during the term of the insurance policy, regardless of when the "occurrence" that causes the property damage happens and regardless of when a claim is first made. *See* James F. Hogg, *The Tale of a Tail*, 24 Wm. Mitchell L.Rev. 515, 516 (1998). Here, the parties have apparently agreed that the "property damage" began with respect to each home on the closing date of its sale by Wooddale and continued until the end of remediation.

■■■ Minnesota follows the "actual injury" or "injury in fact" rule to determine which insurance policies have been "triggered" by an occurrence for which an insurer must indemnify its insured. *N. States Power Co. v. Fid. & Cas. Co. of N.Y.*, 523 N.W.2d 657, 662 (Minn.1994) (*NSP*). Under this rule, a liability policy is "triggered" if the complaining party (here, the homeowner) is actually damaged during the policy period, regardless of when the underlying negligent act occurred. *Id.* at 663. Thus, an insurer is on the risk with respect to a particular home if, during the period of one of its policies, there is property damage to that home—

provided the damage results from a covered occurrence.

■■■ Notwithstanding this general rule, the terms of the policies at issue prevent an insurer from becoming liable for damages to a home during the insurer's policy period, if the property damage was "expected" from Wooddale's standpoint before the policy period began. Each of the policies issued to Wooddale specifically excludes coverage for property damage "expected or intended from the standpoint of the insured." [7] As a result, once Wooddale receives notice of claim with respect to a particular home, any subsequent damage with respect to that claim is "expected," and all subsequent insurance policies exclude coverage for damage with respect to that claim.[8] Based on this policy language, we conclude that once a specific notice of claim is received by Wooddale, no subsequent insurance policy can be on the risk with respect to that claim.

Our conclusion that the policy language excludes coverage for claims of property damage of which the insured was aware before a particular policy took effect is supported by the rationale behind the known loss doctrine and its counterpart, the "loss in progress" doctrine. *Waseca Mut. Ins. Co. v. Noska*, 331 N.W.2d 917, 924–25 n. 6 (Minn.1983); *Hooper v. Zurich Am. Ins. Co.*, 552 N.W.2d 31, 34–35 (Minn. App.1996) (stating that loss-in-progress doctrine bars insured from insuring against an ongoing risk of which the insured already had notice); *Buckeye Ranch, Inc. v. Northfield Ins. Co.*, 134 Ohio Misc.2d 10, 839 N.E.2d 94, 105 (Ct. Common Pleas 2005) (stating that "the

---

7. Application of an insurance policy provision excluding property damage expected by the insured is an issue we were not asked to address in *NSP* because NSP voluntarily dismissed before trial those insurers that had provided coverage to it after NSP had notice of the claim.

8. Here, as was noted earlier, it is important to keep in mind that in the context of this appeal, it is undisputed that water intrusion damage to affected homes will continue to occur until remediation of that home.

common exclusion for 'expected or intended' injury is conceptually similar to the 'known loss' doctrine"). In a recent Ohio case, the known loss doctrine was described as "a compilation of practical concepts intended to prevent a windfall for insureds and manifest unfairness for the insurance industry." *Buckeye Ranch, Inc.,* 839 N.E.2d at 104. We have explained the rationale behind the known loss doctrine as follows:

> Insurance cannot be issued for a known loss. Once the loss has occurred, there is no longer any "risk." Hence, where the loss has occurred prior to the application for insurance, the relevant question is * * * whether the parties, particularly the insured, knew of the loss at the time of application, since the knowledge would be nearly conclusive evidence as to bad faith.

*Waseca,* 331 N.W.2d at 924–25 n. 6 (citation omitted); *see also Domtar, Inc. v. Niagara Fire Ins. Co.,* 563 N.W.2d 724, 737 (Minn.1997).[9]

■ The practical effect of the policy language excluding expected damage and the rationale behind the known loss/loss in progress doctrine is that no additional insurance policies are triggered by continuing damage to homes for which claims had been made before those policies took effect. For example, Wooddale's policies for the years 2001 and 2002 are not triggered by continuing damage related to a claim of which Wooddale had notice in 2000, even if remediation is not complete.[10] We therefore hold that only insurers that provided coverage to Wooddale between the closing date of a particular home and Wooddale's receipt of notice of claim with respect to that property are on the risk for that claim.[11]

*2. Whether the Insurers On the Risk Are Deemed to be On the Risk for All or Only Part of Each Triggered Policy*

■ Having determined which insurers are on the risk for a particular claim, i.e., which policies are triggered, we must now determine whether the insurers on the risk are deemed to be on the risk for all or only part of each triggered policy. To answer this question we must first determine whether an insurer remains on the risk through the end of a triggered policy period, or if the insurer is on the risk only through the actual date of notice of claim. We are aware of no basis for concluding that an insurer is only liable for damage through the actual date of a notice of claim rather than for all damages occurring during the policy period in which notice is given. Nor do the parties point us to language in any of the policies that pro-

---

9. In a Sixth Circuit Court of Appeals case, that court recognized that previous decisions require either "(1) an awareness of a loss on the part of the insured or (2) an immediate threat of loss tantamount to foreknowledge in order for the doctrine to defeat coverage." *Inland Waters Pollution Control, Inc. v. Nat'l Union Fire Ins. Co.,* 997 F.2d 172, 176 (6th Cir.1993). The Sixth Circuit then summarized, "The lesson of these cases * * * is that the doctrine operates only where the insured is aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and that the insured knew it at the time the policy was issued or applied for." *Id.* at 178.

10. Under the known loss doctrine, even if Wooddale had insurance coverage for water intrusion damage after 2002, these later policies would not cover continuing damage to homes for which claims had already been made.

11. This part of our analysis does not answer the question whether insurance policies that *are* triggered before notice of a claim are obligated to cover continuing damages incurred by the homeowner after Wooddale received notice of the claim. We answer that question in our consideration of the total damages to be allocated (factor C).

vides that the insurer will only indemnify its insured for those damages occurring before notice of a claim. Instead, each of the policies provides coverage for "property damage" that "occurs during the policy period," indicating that the insurer has agreed to indemnify the insured for damages that occur during the entire policy period, including the part of the policy period that runs after notice of the claim. We therefore hold that the insurer that provided coverage to Wooddale on the date of notice of a particular claim remains on the risk through the end of the policy period in which Wooddale received notice of that claim.

■ Our holding with respect to the end of a triggered policy period points us to another question—what is the beginning date? None of the parties have specifically asked us to determine whether the beginning date for the time on the risk of the first triggered policy is (1) the actual date of closing on the home or (2) the beginning date of the policy period in which the closing occurred. In its appeal to the court of appeals, SafeCo sought clarification of the district court's order with respect to the length of time during which an insurer is on the risk. Specifically, SafeCo asked whether the entire policy period applies for purposes of allocation if a policy is triggered or if there is coverage for only the days, weeks, or months of the policy period that follow the date of closing. *Wooddale I*, 695 N.W.2d at 407. The court of appeals dismissed SafeCo's appeal because it concluded that the issue had not been raised to the district court. *Id.* No party sought review of this issue; nevertheless, we conclude that a determination of the specific beginning date of an insurer's time on the risk is a necessary part of our analysis. Accordingly, we will address this issue.

■ We again note that the policies at issue provide coverage for "property damage" that "occurs during the policy period," indicating that the entire policy period is the unit of time that is relevant to an insurer's obligation. Our conclusion as to the import of this policy language is supported by our decision in *NSP*. In *NSP*, we stated that under the pro-rata-by-time-on-the-risk method, each triggered policy bears a share of the total damages "proportionate to *the number of years* it was on the risk relative to *the total number of years* of coverage triggered." 523 N.W.2d at 663 (emphasis added). While the significance of our reference to "years" in *NSP* is not explained in the context of that opinion, we nevertheless conclude that this language in *NSP* is consistent with the general principles underlying the pro-rata-by-time-on-the-risk method, and indicates that when a policy is triggered, the entire policy period is considered for allocation purposes. We therefore hold that the period of time on the risk for the first policy triggered by damage to a home begins on the beginning date of the policy period in which the closing on the home occurred.

■ Therefore, with respect to each insurer's time on the risk (factor A), we hold that under the facts presented here, the insurers on the risk with respect to a claim are those insurers that insured Wooddale between the closing date of the home involved and the date on which Wooddale received notice of the claim with respect to that home, and that all insurers on the risk are deemed to be on the risk for the entire period of each triggered policy.

*Total Period Over Which Liability Is Allocated (Factor B)*

■ We now turn to the definition of the total period over which liability is allocated (factor B). Insurers that provided coverage to the insured during the liability

allocation period are liable for a proportionate share of damages, unless the insurer can show that no appreciable damage occurred during its triggered policy period. *NSP,* 523 N.W.2d at 664. Thus, determining the length of the total period over which liability is to be allocated is a necessary step in calculating the proportionate liability of each insurer.

As previously noted, the parties have agreed that the beginning date of the total period over which liability is allocated is the closing date on the purchase of the home. But the parties disagree as to the proper end date. Although we have applied the pro-rata-by-time-on-the-risk method on two previous occasions, we have not yet been required to consider specifically what end date of the total period over which liability is allocated best complies with general insurance law policies and principles. *See Domtar,* 563 N.W.2d 724; *NSP,* 523 N.W.2d 657. Here, it is important to note that our analysis of the total period over which liability is allocated (factor B) may appear to overlap to a degree with our analysis of the total damages to be allocated (factor C). The total period over which liability is allocated (factor B) does not necessarily define the total damages to be allocated (factor C), but the definition of the former can affect the amount of damages that are allocated to the insurers versus the amount of damages allocated to the insured, Wooddale. This distinction exists because of the possibility, as we will discuss in more detail later, that the insured (Wooddale) was self-insured during part of the total period over which liability is allocated. However, because the analysis of a self-insured period is secondary to the general definition of the total period over which liability is allocated, we will first address the general definition in the context of an insured who has continuous insurance coverage through notice of a claim.

Under the "actual injury" rule, as we described it in *NSP,* the insurer is liable for only that damage that occurs during the period of its policy. In *NSP* we concluded that the essence of the actual injury rule is that each insurer is held liable only for those damages that occurred during its policy period. 523 N.W.2d at 662. We held that when policy periods do not overlap, insurers are consecutively, not concurrently, liable, such that no insurer is liable for damages occurring outside its policy period. *Id.* But our application of the "actual injury" rule has not hewn strictly to our description in *NSP* and *Domtar.* For example, in *SCSC,* we held that when a discrete event gives rise to property damage, the insurer whose policy was in effect at the time the discrete event occurred is liable for all damage that results from that event, even when the damage persists for many years. *See SCSC Corp. v. Allied Mut. Ins. Co.,* 536 N.W.2d 305, 318 (Minn.1995) (holding that when environmental damage resulted from a single chemical spill in 1977, only those policies on the risk in 1977 were responsible for the cost of remediation of ensuing continual leach of chemicals into groundwater until detection in 1988). *See also In re Silicone Implant Ins. Coverage Litig.,* 667 N.W.2d 405 (Minn.2003). Accordingly, when a discrete event gives rise to damages, it is reasonable for the insured to expect that its insurer on the risk at the point of initial injury will pay all damages that follow from that discrete event, regardless of when remediation occurs. This result is consistent with our consideration of the parties' intent or reasonable expectations in construing insurance policies. *See Atwater Creamery Co. v. W. Nat'l Mut. Ins. Co.,* 366 N.W.2d 271, 278 (Minn. 1985).

We note, however, that the foregoing principle does not transfer neat-

ly to the pro-rata-by-time-on-the-risk method, in which damages are to be allocated among the multiple policies in effect during the period over which damages occurred. *NSP*, 523 N.W.2d at 664. Nonetheless, assuming the insured has continuous insurance coverage through notice of the claim, we conclude that there is no reason for the insured's coverage, or the insurers' obligations, to be diminished simply because the damages arise from a series of events rather than a single discrete occurrence. Therefore, when an insured has continuous insurance coverage through notice of claim, we conclude that the total period over which liability is allocated (factor B) is the sum total of each individual insurer's period of time on the risk, i.e., the sum total of the time periods identified under factor A.[12]

Our analysis of the total period over which liability is allocated becomes more complicated when, as here, the insured lacks insurance coverage for a part of the period over which damages occur. Indeed, in *NSP* we rejected the argument that each insurer on the risk agreed to be liable for "all sums" the insured became obligated to pay as a result of property damage deemed to be continuous and indivisible. *Id.* at 662. Similarly, in *Domtar*, we held that the insured was not entitled to coverage for total damages when the insured lacked insurance coverage for many years during which property damage occurred. *Domtar*, 563 N.W.2d at 732. In *Domtar*, we explained why we limited an insurer's obligations to those damages allocated to the insurer's respective policy period when we said "[t]he factual presumption of continuous damage cannot be amended solely to benefit the insured." *Id.* at 733.

The record does not reflect the reasons for or the circumstances surrounding Wooddale's lack of water intrusion insurance coverage after November 2002. The possibility that water intrusion damage coverage was available to Wooddale after November 2002 presents the question whether an insured, like Wooddale, should receive the benefit of coverage for periods during which it may have deliberately purchased no coverage and paid no premiums. In other words, for allocation purposes, the question is whether the insured should be responsible for all or part of any time periods during which the insured lacked insurance coverage.

How we answer the foregoing question will affect the total time period over which liability is allocated and to which parties damages are ultimately allocated. If, for example, we were to conclude that when an uninsured period was voluntary—the party was self-insured—this time period should be included in any allocation, then the period over which liability is allocated would include the self-insured periods and the self-insured would bear a proportionate share of liability. On the other hand, if we were to exclude self-insured periods from the allocation, then the self-insured would bear no portion of the liability. It appears from the record that Wooddale received notice of at least one claim after the November 2002 expiration of its last applicable insurance policy. Thus our determination of the end date of the period over which liability is allocated affects not only the allocation of damages among insurers, but also whether any damages are to be allocated between the insurers and Wooddale as a self-insured party.

12. Thus, due to the exclusion of expected damage and the known loss doctrine, no insurer comes on the risk after notice of a particular claim has been given, and if Wooddale had continuous insurance coverage for water infiltration damage through notice of the claim, the insurers on the risk must indemnify Wooddale for all damages.

At this point it is helpful to examine what other jurisdictions have done with the issue of uninsured or self-insured periods in allocating liability. Several courts have held that the insured is responsible for its pro rata share of the loss during periods it was self-insured or otherwise without coverage. For example, in *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178 (2d Cir.1995), *modified on other grounds*, 85 F.3d 49 (2d Cir.1996), the Second Circuit allocated damages to the insured for those years in which the insured either elected not to purchase CGL coverage or purchased insufficient coverage and thereby exhausted its policy limits. *Id.* at 1203. Similarly, in *Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386 (8th Cir.1996) (applying Minnesota law), a case involving CGL insurance coverage for sexual molestation by a diocesan priest, the Eighth Circuit concluded that the archdiocese lacked insurance for part of the time during which the molestation occurred because at some point the archdiocese should have known of the priest's proclivities, and the abuse was no longer an unexpected occurrence. *Id.* at 1396. The court therefore held the archdiocese liable for a pro rata share of the damages awarded to the victim, even though the archdiocese had purchased CGL insurance that covered the victim's claims for at least part of the time during which the abuse had occurred.[13] *Id.* But

courts that allocate damages to the insured for uninsured periods generally do not assess the insured a pro rata share of the damages for time periods in which insurance was not available to the insured. *See, e.g.*, *Stonewall Ins.*, 73 F.3d at 1203–04 (declining to allocate losses to the insured after 1985, when asbestos liability insurance was no longer available); Allan D. Windt, *Insurance Claims & Disputes: Representation of Insurance Companies and Insureds* § 6:47 (4th ed. 2001) (citing cases for the proposition that the insured is allocated a share of liability "only under those circumstances that a failure to allocate a part of the liability to the insured would truly result in a windfall to the insured, by treating [the insured] the same as [other] insureds that chose to purchase an appropriate amount of insurance").

 Allocating damages to the insured for periods during which it elected to be self-insured, but not allocating damages for periods during which water intrusion coverage was not available to the insured, results in holding the insured responsible for only those risks that it elected to assume. *Stonewall Ins.*, 73 F.3d at 1204. At the same time, this approach eliminates any windfall to the insured that would result if the insured received a benefit of insurance coverage that it had deliberately declined to purchase. We therefore conclude that the total period over which lia-

---

13. We differ from the result in *Diocese of Winona* in one respect. In *Diocese of Winona,* the Eighth Circuit allocated liability between insurers and insured on a monthly, rather than on a policy year, basis. *Id.* at 1396. That is, the court determined that the archdiocese knew or should have known of the priest's activities in December 1980. The insurer, Interstate, insured the archdiocese beginning on September 1, 1980. The court allocated damages to Interstate for only the period from September 1, 1980, through December 1980. Under our holding above with respect to factor A, Interstate would be on the

risk for the entire period of its policy, that is, from September 1, 1980, to September 1, 1981. We attribute the difference in result to the difference in the underlying facts. In *Diocese of Winona,* coverage ended when the insured "knew or should have known" of the ongoing abuse, *id.*; it appears the victim did not make a claim or provide notice of claim until years after the abuse ended. Here, there is no indication that Wooddale knew or should have known of the damage to any particular home until it received notice of the claim.

bility is allocated must include any times during which damages occurred but Wooddale was voluntarily self-insured.

On appeal, Wooddale claims that it was unable to purchase water intrusion insurance after November 2002. As we indicated above, the record does not indicate why Wooddale had no such coverage after November 2002, and it appears the issue was not considered below. Therefore, on remand, the determination whether the total period over which liability is allocated should include periods during which Wooddale lacked insurance will require a factual determination by the district court.

■■■ For all of the foregoing reasons, we hold that if on remand Wooddale establishes that no water intrusion insurance coverage was available to it after November 2002, the total period over which liability is allocated for each of the sixty claims ends with the end of the policy year in which Wooddale received notice of the claim or with the end of the last period of insurance coverage (November 2002), whichever is earlier. But if Wooddale was voluntarily self-insured during a time when damages occurred, then the total period over which liability is allocated for each claim must include the time period that Wooddale was self-insured and said time period will end with the end of the policy year in which Wooddale received notice of the claim or with the date of notice of claim, whichever is later.

■■■ We are aware it is possible under our construction of factor B that an insurer is liable for more than those damages than would otherwise be deemed to have occurred during its policy period. This is possible because our definition of factor B, the period over which damages are to be allocated, excludes periods during which the insured lacked coverage because no such coverage was available. We are also aware that this result may be contrary to the broad language we used in *NSP* to describe the "actual injury" rule, namely, that under this rule each insurer is liable for "only those damages which occurred during its policy period." *NSP*, 523 N.W.2d at 662. However, as we indicated in *NSP*, the allocation of liability between insurers requires a flexible approach. *Id.* at 661. Further, as we noted in *Domtar*, it is inaccurate to conclude that a CGL insurer can never be liable for damages occurring outside of a policy period. 563 N.W.2d at 733. We deem the facts of this case to justify a departure from the typical "actual injury" approach.

### Total Damages To Be Allocated (Factor C)

We next address the total damages to be allocated with respect to each property (factor C). We begin this part of our analysis with the language of the policies. Under each policy at issue, the insurer has agreed to pay "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." This language indicates that the insurers have agreed to pay their allocated share of all amounts Wooddale is legally obligated to pay as damages to homeowners. This interpretation is consistent with the notion of a CGL policy as a policy of indemnification for third-party claims.

■■■ In two previous cases, we have briefly touched upon the extent of damages covered by triggered policies. *Domtar*, 563 N.W.2d at 732; *NSP*, 523 N.W.2d at 663. Both *Domtar* and *NSP* demonstrate that when allocating risk among insurers and when allocating risk between insurers and insured under the pro-rata-by-time-on-the-risk method, we allocate the total damages for which the insured is legally responsible. *Domtar*, 563 N.W.2d at 732; *NSP*, 523 N.W.2d at 663. We

conclude that the policy language here requires the same result. Thus we hold that the total damages to be allocated with respect to each affected home (factor C) are the total damages Wooddale is legally obligated to pay with respect to that home, regardless of whether the damages occurred during the total period over which liability is allocated.

*Damages Allocated To Each Individual Insurer (Factor D)*

The result of applying factors A, B, and C is factor D, the final factor of the equation. Factor D represents the amount of damage allocated to each individual insurer. How our previous conclusions interact to arrive at the amount of damages allocated to each individual insurer can be illustrated by three hypothetical scenarios.

In the first scenario, the home was completed and sold by Wooddale in February 1994; Wooddale received the homeowner's notice of claim of damage in December 1999; and remediation was completed in September 2001. Under our foregoing analysis and the undisputed facts, the insurers on the risk with respect to this scenario are American Family (from November 1993, the inception of the policy during which term the property was sold, to November 1995), West Bend (from November 1995 to November 1996), SafeCo (from November 1996 to November 1997), and Maryland Casualty (from November 1997 to November 2000, the end of the policy period during which Wooddale received notice of the claim). Even though damages continued to accrue until remediation was complete in September 2001, Western National (Wooddale's insurer from November 2000 to November 2002) is not liable for any portion of the damages because once Wooddale received notice of

the claim in December 1999, this home, from Wooddale's standpoint, became a "known" risk as to which further property damage was "expected." Western National's policy (like all of the policies issued to Wooddale) explicitly excludes coverage for property damage that is expected from the standpoint of the insured.

The total period over which liability is allocated (factor B) begins on November 13, 1993, the beginning date of the policy in effect on the closing date of the sale of the home. The damages are allocated across the period from November 1993 to November 2000, a total of seven years, because November 2000 is the later of the end of the policy year in which Wooddale received notice of the claim (November 2000) or the date of notice of claim (December 1999). Therefore, in scenario 1, because notice of the claim was received when Wooddale was still insured, total damages are allocated across the same time period regardless of whether insurance was available after November 2002. Thus, the allocation of damages would be as follows:

| | |
|---|---|
| American Family | 2/7 |
| West Bend | 1/7 |
| SafeCo | 1/7 |
| Maryland Casualty | 3/7 |
| Western National | 0 |
| Wooddale | 0 |

In scenario 2, the home was also completed and sold in February 1994, Wooddale received notice of claim in December 1999, but remediation was not complete until December 2003, after the last policy had lapsed. No insurers whose policies commenced after notice in December 1999 are on the risk, due to the expected damages exclusion. As a result, the same insurers are on the risk in scenario 2 as in scenario 1, and for the same periods of time.[14] The total period over which liabili-

14. Again, as in scenario 1, even though West-

ern National insured Wooddale from Novem-

ty is allocated in scenario 2 also runs from November 1993 through November 2000, even though remediation extended beyond the end of the last policy. Because Wooddale purchased insurance covering the entire period over which damages are allocated, it also would bear none of the damages in scenario 2. The allocation of damages would be as follows:

| | |
|---|---|
| American Family | 2/7 |
| West Bend | 1/7 |
| SafeCo | 1/7 |
| Maryland Casualty | 3/7 |
| Western National | 0 |
| Wooddale | 0 |

The result in this case thus differs from the "actual injury" rule as we broadly described it in *NSP*. If we were to apply the "actual injury" rule as we described it in *NSP* to scenario 2, we would allocate damages evenly from February 1994 until December 2003, when remediation was complete and each insurer would be liable for only the damages allocated to its policy period. By allocating the insured's total damages to the period from the date of sale through only the date of notice of claim, we essentially allocate a larger portion of damages to each policy period.

We deem a deviation from strict application of the "actual injury" rule appropriate, on the facts of this case, for several reasons. First, strict application of the *actual injury* rule would leave Wooddale uninsured with respect to damages allocated to the period between notice of the claim and the end of remediation. This is an artifact of the parties' assumption that damages here are continuous. If the parties had assumed that damages resulted from a single discrete occurrence, such as faulty installation of the windows or the flashing, then under our holding in *SCSC*, the insurer on the risk at the time of that occur-

rence would bear liability for all of the resulting damages, including those damages continuing to accrue after notice of claim to Wooddale.

Second, if the extent of coverage is to turn on whether damages result from a single discrete occurrence or a series of repeated events, the burden will fall to the insured to prove not only that damage was the result of a single discrete occurrence, but during which particular policy period the occurrence took place. We recommended the pro-rata-by-time-on-the-risk method of allocation in *NSP* because we recognized the difficulties inherent in cases such as this in requiring the insured to prove the amount of damages occurring during any one policy period. Comments we made in *NSP* are applicable here. In *NSP*, we said that, given the scientific complexity of the issues involved and the extended period of time over which damages may have occurred before discovery, it may simply not be practical to require the insured to prove the precise point at which damage occurred. *NSP*, 523 N.W.2d at 663. Moreover, even if it were scientifically possible to prove the policy period during which the damage occurred, it may nonetheless be too expensive to do so. *Id.* It would also reduce the likelihood of settlement and, as a matter of public policy, pose great difficulty for insureds. *Id.* As a result, deviation from strict application of the actual injury rule in these circumstances could reduce the costs of litigation. *Id.*

Finally, in scenario 3, the property is sold by Wooddale in February 1994, but Wooddale does not receive notice of claim until November 2003 and remediation is not complete until two years later, in November 2005. Under scenario 3, all insur-

---

ber 2000 to November 2002, it is not on the risk in scenario 2 because Wooddale received notice of the claim in scenario 2 in December

1999, before the inception of coverage by Western National in November 2000.

ers would be on the risk, but under this scenario the availability of water intrusion insurance coverage after November 2002 affects the allocation because Wooddale did not receive notice of the claim until after the last of its policies had lapsed. If Wooddale establishes that no water intrusion insurance for the claim was available after November 2002, then the period over which liability is allocated runs only from November 1993 through November 2002 (the earlier of notice of claim or the lapse of Wooddale's coverage), a total of nine years. The effect of our holding in such a case would be to give Wooddale coverage for the entire claim, even though Wooddale did not receive notice of claim until after its coverage had ended. The allocation of damages would be as follows:

| | |
|---|---|
| American Family | 2/9 |
| West Bend | 1/9 |
| SafeCo | 1/9 |
| Maryland Casualty | 3/9 |
| Western National | 2/9 |
| Wooddale | 0 |

If, on the other hand, water intrusion insurance coverage was available to Wooddale for these claims after November 2002 and Wooddale failed to purchase the insurance, the period over which liability is allocated would run through notice of the claim in November 2003 (the later of the end of Wooddale's insurance coverage or notice of claim), a total of 10 years. Wooddale would then bear a portion (1/10) of the total damages because it deliberately became a self-insured by failing to purchase available insurance after November 2002. The allocation of damages in this situation would be as follows:

| | |
|---|---|
| American Family | 2/10 |
| West Bend | 1/10 |
| SafeCo | 1/10 |
| Maryland Casualty | 3/10 |
| Western National | 2/10 |
| Wooddale | 1/10 |

As illustrated by these scenarios, when all factors of the equation are considered, they provide a means for determining the allocation of damages among individual insurers and Wooddale. We note that our resolution of this case leaves questions unanswered, just as our rulings in *NSP* and *Domtar* did. Like our rulings in *NSP* and *Domtar*, our holdings here must be viewed through the lens of the facts presented to us. Therefore, we do not expect this case to be the "last word" in this area, just as neither *NSP* nor *Domtar* has proven to be the last word, and we continue to emphasize that the district courts must be flexible, as we have been here, in responding to different fact situations.

Finally, because our analysis differs from that used by the court of appeals, we hold that the court of appeals erred in its determination of the amount of damages allocated to each party. Accordingly, we reverse and remand this case to the district court for application of our holdings regarding each insurer's time on the risk, the total period over which liability is allocated, the total damages to be allocated in order to determine the amount of damages allocated to each individual insurer, and, if applicable, any damages to Wooddale.

## II.

■ Next, we must decide whether the district court erred when it allocated defense costs equally among the insurers whose policies were triggered. The apportionment of defense costs among insurers is a question of law that we review de novo. *See Jostens, Inc. v. Mission Ins. Co.*, 387 N.W.2d 161, 165–68 (Minn.1986); *Iowa Nat'l Mut. Ins. Co. v. Universal Underwriters Ins. Co.*, 276 Minn. 362, 366–68, 150 N.W.2d 233, 236–37 (1967).

■ The apportionment of defense costs among insurers when (1) the pro-rata-by-time-on-the-risk liability method applies and (2) the insurers participated in providing a defense is an issue of first

impression for our court, but our previous decisions on insurance defense apportionment provide a helpful backdrop for our analysis. It is axiomatic that the duty to defend is broader than the duty to indemnify. *Domtar*, 563 N.W.2d at 737; *Jostens*, 387 N.W.2d at 167; *Brown v. State Auto. & Cas. Underwriters*, 293 N.W.2d 822, 825 (Minn.1980). The duty to defend is broader than the duty to indemnify in three ways: (1) the duty to defend extends to every claim that "arguably" falls within the scope of coverage; (2) the duty to defend one claim creates a duty to defend all claims; and (3) the duty to defend exists regardless of the merits of the underlying claims. *Meadowbrook, Inc. v. Tower Ins. Co.*, 559 N.W.2d 411, 415–19 (Minn.1997).

Here, the court of appeals reversed the district court and held that defense costs should be allocated pro rata by time on the risk. The court of appeals concluded that principles of equity require that defense costs be allocated in the same manner as indemnity costs. We disagree.

■■■■ We are not persuaded by the court of appeals' assertion that "[t]he majority of jurisdictions that have addressed allocation of defense costs among consecutively liable insurers have held that defense costs should be apportioned according to the same methodology as indemnity costs." *Wooddale I*, 695 N.W.2d at 407. First, the allocation of defense costs in the same manner as the allocation of liability may not necessarily be the majority rule when the allocation is among consecutive rather than concurrent insurers. *See* Windt, *supra*, §§ 4:45, 7:6. Second, the jurisdictions that have applied the pro-rata-by-time-on-the-risk method to allocation of defense costs appear to base their

decisions, as the court of appeals did in this case, simply on principles of equity and fairness in the absence of precedent. *See, e.g., Ins. Co. of N. Am. v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1225 (6th Cir.1980). It is well-established under Minnesota case law that each insurer owes its insured an independent duty to defend, and an insurer that provides a defense is not entitled to recovery of costs from the insurers that did not provide a defense. *Iowa Nat'l Mut. Ins. Co.*, 276 Minn. at 367–68, 150 N.W.2d at 236–37; *see also St. Paul Sch. Dist. No. 625 v. Columbia Transit Corp.*, 321 N.W.2d 41, 48 (Minn.1982). Accordingly, under our case law, absent a loan receipt agreement, an insurer that undertakes the defense of its insured may not seek recovery of defense costs from the insured's other insurers who also owed a duty to defend but failed to provide a defense. *Iowa Nat'l Mut. Ins. Co.*, 276 Minn. at 367–68, 150 N.W.2d at 236–37 (*Iowa National* rule).[15]

■■■■ In contrast with the *Iowa National* rule that bars recovery of defense costs by an insurer that provides a defense to its insured, when *no insurer* undertakes the defense of an insured, the *insured* may recover its defense costs from *any* of its insurers, and "the insurers, as between them, shall be equally liable for the insured's defense costs." *Jostens*, 387 N.W.2d at 167. West Bend argues that the rule in *Jostens* of equal liability among insurers that fail to provide a defense is not applicable when the pro-rata-by-time-on-the-risk liability allocation method applies. But in *Domtar*, when no insurer provided a defense of the insured, and liability was allocated pro rata by time on the risk, we reiterated and applied the rule

---

**15.** The insurers in this case have waived the *Iowa National* rule that bars recovery in the absence of a loan receipt agreement.

of *Jostens,* stating: "an insured 'may * * * recover his costs * * * from *either or both* insurers' and that only '*as between [the insurers]*' are insurers equally liable for such costs."[16] *Domtar,* 563 N.W.2d at 739. Accordingly, regardless of which liability allocation method is used, *when no insurer provides a defense to the insured,* the insured may recover its defense costs from any one of its insurers, and as between the insurers, there is equal liability for defense costs.

While instructive, our analyses in *Jostens* and *Domtar* do not resolve the issue before us, which is the apportionment of defense costs among insurers that *have* participated in providing a defense to their common insured, but are entitled to recovery from each other despite the absence of a loan receipt agreement. Nevertheless, our holdings in *Jostens* and *Domtar* direct us toward the conclusion that when liability is allocated pro rata by time on the risk and the insurers on the risk have participated to some degree in providing a defense to their common insured, defense costs should be apportioned equally. Moreover, this result is supported by policy reasons as well as precedent. We stated in *Jostens* that allowing an insured to seek recovery of defense costs from any insurer, but making insurers equally liable among themselves, "will encourage [the] insurers, when tendered a defense, to resolve promptly the duty to defend issue either by some cooperative arrangement between them, or by a declaratory judgment action, or by some other means." *Jostens,* 387 N.W.2d at 167.

The court of appeals concluded that allocation of defense costs pro rata by time on

the risk would not delay the resolution of the duty-to-defend question among insurers because any insurer that provides a defense to the insured will ultimately be entitled to recovery from the other insurers. Again, we disagree. At the time an insured's defense costs begin to accrue, there will not yet have been a judicial determination of whether the pro-rata-by-time-on-the-risk method even applies, much less the proportionate liability of each insurer. Under the court of appeals' rule, an insurer that anticipates a small proportionate share of liability may have less incentive to provide a prompt defense because the insurer will have less interest in the outcome of the case, and may expect other insurers to undertake the defense of the insured. On the other hand, insurers likely to bear a large proportionate share of liability under the pro-rata-by-time-on-the-risk method will also have an incentive to refuse to provide a defense because if no insurer defends the suit, the insurer would ultimately be liable only for an equal share of defense costs under *Jostens* and *Domtar.* The foregoing incentives for delay if defense costs are allocated pro rata by time on the risk parallel the "wait and see" attitude that we attempted to discourage in *Jostens.* Moreover, such an attitude conflicts with the general rules that the duty to defend is contractual and is broader than the duty to indemnify.

■ We believe that the best approach to resolving this issue is to have a rule that encourages insurers to "resolve promptly the duty to defend issue." *See Jostens,* 387 N.W.2d at 167. If insurers know from the beginning that defense costs will be apportioned equally among insurers whose

---

**16.** Moreover, in *Domtar,* we rejected the argument that an insurer is liable solely for defense costs allocable to the period of time it was on the risk when we allocated all defense costs to the insurer, despite the fact that the insured was partially liable for indemnity costs due to uninsured periods during the liability allocation period. *Domtar,* 563 N.W.2d at 741.

policies are triggered, the possibilities for delay will be minimized because no insurer will benefit from delaying or refusing to undertake a defense. Therefore, we conclude that when the pro-rata-by-time-on-the-risk method applies to allocation of liability, and insurers participate in providing a defense to a common insured—but recovery of defense costs is not barred by the *Iowa National* rule—defense costs are apportioned equally among insurers whose policies are triggered. Therefore, we hold that the district court did not err when it apportioned defense costs equally among insurers whose policies were triggered.

Reversed and remanded to the district court.