PELLA CORPORATION, Pella Windows and Doors, Inc., and Pella Windows and Doors of Ontario Corp., Plaintiffs,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Defendant.

Liberty Mutual Insurance Company, Third–Party Plaintiff,

v.

Pella Corporation and Pella Windows and Doors of Ontario Corp., Third–Party Defendants.

No. 4:11–cv–00273–JEG

United States District Court, S.D. Iowa, Central Division.

Signed 3/22/2017

As corrected Aug. 15, 2017, nunc pro tunc

Adam S. Ziffer, Pro Hac Vice, Kenneth H. Frenchman, Pro Hac Vice, Marc Thomas Ladd, Pro Hac Vice, John P. Winsbro, Pro Hac Vice, Keith McKenna, Pro Hac Vice, Robin L. Cohen, Pro Hac Vice, McKool Smith, Burt M. Garson, Pro Hac Vice, Kasowitz Benson Torres & Friedman LLP, New York, NY, Stephen R. Eckley, Richard W. Lozier, Jr., Belin McCormick, P.C. Des Moines, IA, for Plaintiffs/Third–Party Defendants.

Maryanne B. Foster, Pro Hac Vice, Charles W. Browning, Pro Hac Vice, Jeffrey C. Gerish, Pro Hac Vice, Kenneth C. Newa, Pro Hac Vice, Lauren Beth McMillen, Pro Hac Vice, Plunkett Cooney, Bloomfield Hills, MI, Robert V.P. Waterman, Jr., Lane & Waterman LLP, Davenport, IA, Shannon L. H. Phillips, Pro Hac Vice, Collins Einhorn Farrell PC, Southfield, MI, for Defendant/Third–Party Plaintiff.

## ORDER

JAMES E. GRITZNER, Senior Judge

This matter comes before the court on cross-motions for partial summary judgment filed by Plaintiffs Pella Corporation, Pella Windows and Doors of Ontario Corporation, and Pella Windows and Doors, Inc. (collectively, Pella), and Defendant Liberty Mutual Insurance Company (Liberty). Both parties have filed responses and replies. A hearing on the Motions was held on February 15, 2017. Attorneys Keith McKenna, Marc Ladd, and Richard Lozier were present on behalf of Pella, and attorneys Charles Browning, Jeffrey Gerish, and Robert Waterman were present on behalf of Liberty. The matter is fully submitted and ready for disposition.

## I. BACKGROUND

Pella purchased annual liability insurance policies from Liberty covering the years between 2000 and 2008. These insurance policies fell under two categories. Comprehensive general liability policies (CGL Policies) insured Pella for certain damages and costs, including defense costs, subject to deductibles called self-

insured retentions (SIRs). "Aggregate SIR Policies," also referred to as "Excess Indemnity Policies," offered coverage for payment of SIRs under each of the GCL Policies, subject to a separate deductible, called "Insured's Retentions."

In the present action, Pella seeks reimbursement of certain expenses incurred in defending against and resolving (by settlement or damage awards) various claims against Pella. Because there are many disputed underlying lawsuits against Pella, the litigation focuses on fifteen of the highest value claims (the Sample Claims). With a few exceptions, the Sample Claims generally allege that Pella's windows were defectively designed, manufactured, or installed, and allowed water intrusion to buildings that resulted in third-party property damage or personal injury.

The parties have made a number of summary judgment motions bearing on disputed issues in this litigation. This Court has already resolved two, holding that the Sample Claims did allege property damage caused by an occurrence and thus triggered Liberty's defense coverage obligation under the CGL Policies. ECF No. 222; see also Pella Corp. v. Liberty Mut. Ins. Co., No. 11–cv–00473–JEG, 221 F.Supp.3d 1107, 2016 WL 6514171, at *20 (S.D. Iowa Nov. 1, 2016). Also pending before the Court are a motion by Pella for a declaration that costs incurred for settlements and judgments in connection with the Sample Claims are covered under the CGL Policies, ECF No. 170, a motion by Pella that each Sample Claim constitutes exactly one "occurrence" as defined in the CGL Policies, ECF No. 171, and a motion by Liberty to dismiss claims by Pella relating to Aggregate SIR Policies from 2002–2008, ECF No. 117.

The Motions addressed in this Order concern the manner in which payments for covered occurrences should be allocated across various insurance policies. Pella's Motion for Partial Summary Judgment on the Issue of Allocation (Pella's Motion), ECF No. 98, seeks a declaration that under Iowa law, each Aggregate SIR Policy purchased from Liberty during the relevant period jointly and severally provides coverage for covered expenses (i.e., defense costs and indemnity payments that satisfy the SIRs of the corresponding CGL Policies), subject to applicable deductibles and policy limits.[1] (Pella's Motion 1) Pella's request would require the Court to determine that the CGL Policies call for "all-sums" allocation rather than pro rata allocation, which would allow Pella to allocate its full covered expenses for a given occurrence to one CGL Policy (and thus one corresponding Aggregate SIR Policy), rather than spread the expenses across each triggered policy period. (Pella's Motion 3) Liberty's Motion for Partial Summary Judgment on Allocation (Liberty's Motion), ECF No. 167, seeks a declaration that under Iowa law, the pro rata, time-on-the-risk allocation method applies to the CGL Policies. (Liberty Motion 3) Liberty also seeks a declaration regarding the particular policy years triggered by each of the Sample Claims and thus subject to (or available for) allocation.[2] (Liberty Motion 3)

---

1. At the time Pella moved for partial summary judgment on allocation, its complaint only demanded relief under the Aggregate SIR Policies; Pella has since amended its complaint to demand relief under either the CGL Policies or the Aggregate SIR Policies, depending on this Court's rulings on these and other summary judgment motions.

2. Liberty also argues that Pella's Motion is premature, having been filed before discovery proceeded to the extent that would allow consideration of the facts of the Sample Claims. Pella's Motion only requests a declaration on the method of allocation to be applied in this case, not a declaration regarding how precisely damages from any occurrences are to be

## II. APPLICABLE LEGAL STANDARDS

The Court shall grant summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the movant makes such a showing, to avoid summary judgment the nonmovant must "set out 'specific facts showing that there is a genuine issue for trial.'" Id. (quoting Celotex, 477 U.S. at 324, 106 S.Ct. 2548). A genuine issue for trial requires more than "some metaphysical doubt as to the material facts." Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

As with the other motions in this case, Iowa law governs this diversity action. "In interpreting state law, [federal courts] are bound by the decisions of the state's highest court." Allstate Indem. Co. v. Rice, 755 F.3d 621, 623 (8th Cir. 2014) (citation omitted). Where definitive guidance from a state's highest court is lacking, this Court must attempt to predict how the state's highest court—the Iowa Supreme Court—would rule. See Sletten & Brettin Orthodontics, LLC v. Cont'l Cas. Co., 782 F.3d 931, 934 (8th Cir. 2015). Decisions of the Iowa Court of Appeals are persuasive authority when they are the best evidence of Iowa law, but state intermediate appellate court decisions do not

control. See Allstate, 755 F.3d at 624. The opinions of state trial courts may provide "some evidence" of how a state's highest court would rule but are considerably less persuasive than reported appellate rulings; contrary authority may lurk within an extensive body of unreported trial court decisions. See Brown v. Youth Servs. Int'l of S. D., Inc., 89 F.Supp.2d 1095, 1102 (D.S.D. 2000); see also Hampton Co. Nat'l. Sur., LLC v. Tunica Cty., Miss., 543 F.3d 221, 226 (5th Cir. 2008) ("State trial court decisions are treated somewhat differently, and quite naturally, with somewhat less deference than is given to state appellate courts.") (quoting 19 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4507 (3d ed. 2008)); Twin City Fire Ins. Co. v. Ben Arnold–Sunbelt Beverage Co. of S.C., 433 F.3d 365, 370 (4th Cir. 2005) ("[A] federal court sitting in diversity is not bound by a state trial court's decision on matters of state law."); Houbigant, Inc. v. Fed. Ins. Co., 374 F.3d 192, 199 n.9 (3d Cir. 2004) ("Because Villa[ Enters. Mgmt., Ltd. v. Fed. Ins. Co., 360 N.J.Super. 166, 821 A.2d 1174 (N.J. Super. Ct. Law Div. 2002)] is only a trial court decision, it is not necessarily entitled to such deference. Nonetheless, we consider the Villa decision to the extent that the quality of its analysis convinces us that the New Jersey Supreme Court would decide the issue similarly."). Additionally, where there is a paucity of authority from the Iowa Supreme Court, or even from the Iowa Court of Appeals, this Court may look to the reasoning from other states' courts for guidance. See Vennemann v. Badger Mut. Ins. Co., 334 F.3d 772, 773 (8th Cir. 2003).

Iowa's general "rules governing the construction and interpretation of insurance policies are well-settled." Amish Connection, Inc. v. State Farm Fire &

---

allocated across policies; if it was premature    when filed, it certainly is not now.

Cas. Co., 861 N.W.2d 230, 236 (Iowa 2015). The cardinal rule is that the "intent of the parties at the time the policy was sold must control." Id. (quoting LeMars Mut. Ins. Co. v. Joffer, 574 N.W.2d 303, 307 (Iowa 1998)). Iowa courts distinguish between interpretation and construction of insurance policies. Boelman v. Grinnell Mut. Reinsurance Co., 826 N.W.2d 494, 501 (Iowa 2013). Interpretation involves giving meaning to the words of the policy. "Policy interpretation is always an issue for the court, unless [the court is] required to rely upon extrinsic evidence or choose between reasonable inferences from extrinsic evidence." Id. Iowa courts give undefined words in an insurance policy their ordinary meaning. "The plain meaning of the insurance contract generally prevails." Id. Iowa courts will not interpret an insurance policy to render any part superfluous, unless doing so is reasonable and necessary to preserve the structure and format of the provision. Id. at 502.

Construction of an insurance policy involves giving legal effect to the contract, which is always a matter of law for the court. Id. at 501. Courts are to determine the intent of the parties by "looking at what the policy itself says." Id. When read as a whole, a policy is ambiguous if the language is "susceptible to two reasonable interpretations." Id. However, a policy is not ambiguous simply because the parties disagree on its meaning or it could have been worded more precisely. Amish Connection, 861 N.W.2d at 236. "If the policy is ambiguous, [Iowa courts] adopt the construction most favorable to the insured," because insurance policies are adhesion contracts. Boelman, 826 N.W.2d at 502.

## III. METHOD OF ALLOCATION

There are two general approaches for allocating covered expenses to various insurance policies where an occurrence causes damage during multiple policy periods. The all-sums approach, which is generally synonymous with joint and several liability across policy periods, allows for the insured to allocate its covered expenses to any triggered policy. See MidAmerican Energy Co. v. Certain Underwriters at Lloyd's London, Case No. CL 107142, 2010 WL 6726865 (Dist. Ct. Iowa, Polk County, Dec. 22, 2010), ECF No. 98–7 at 211. Under the pro rata approach, coverage is distributed proportionally across all triggered policy years. Id. Pella advocates for application of the all-sums approach with respect to both defense costs and indemnity costs. Liberty argues for application of the pro rata approach.

### A. The CGL and Aggregate SIR Policies

Pella and Liberty entered into eight successive CGL Policies, each bearing a one year term, beginning on September 1, 2000. These policies provide coverage for various expenses including damages incurred by Pella for bodily injury and property damage caused by Pella products, as well as associated costs for defending against claims based on allegations of those damages. The coverage provision of the CGL Policies (labeled "Insuring Agreement") reads:

> We will pay those sums in excess of the "Self–Insured Amount" that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this excess insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for in SECTION V SUPPLEMENTARY PAYMENTS/ALLOCATED LOSS ADJUSTMENT EXPENSE. This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period. The "bodily injury" or "property damage"

must be caused by an "occurrence." The "occurrence" must take place in the "coverage territory." The amount we will pay for damages is limited as described in SECTION IV—LIMITS OF INSURANCE.

2000–01 CGL Policy at 35, ECF No. 123 Ex. J.[3] The per-occurrence SIR for the 2000–01 and 2001–02 polices was $500,000; for the remaining policies between 2002 and 2008, it was $1,000,000. Also counting against the SIR under the CGL Policies are "Allocated Loss Adjustment Expense" (ALAE). 2000–01 CGL Policy at 34. ALAE primarily encompasses costs incurred to defend against claims that arguably or potentially allege an occurrence; it is defined as including but not limited to "reasonable attorneys' fees for claims in suit." 2000–01 CGL Policy at 50. The CGL Policies also contain what is called a Non–Cumulation Provision, which reads:

> If one "occurrence" causes "bodily injury," "personal injury" and/or "property damage" during this policy period and during the policy period of one or more prior and/or future policy(ies) that include(s) a general commercial liability coverage form issued to you by us, then this policy's Each Occurrence Limit will be reduced by the amount of each payment made by us under the other policy(ies) because of such "occurrence."

2000–01 CGL Policy at 11. The Each Occurrence Limits are coverage maximums based on the type of damages claimed; for the 2000–01 and 2001–02 CGL Policies, the Each Occurrence Limit for "Bodily Injury and Property Damage Liability" was $500,000; for the remaining policies, it was $1,000,000.

Pella and Liberty also entered into eight one-year Aggregate SIR Policies alongside the CGL Policies covering the same period from 2000 to 2008. The Aggregate SIR Policies specify that "[Liberty] will indemnify [Pella] for Payment Amounts that exceed the Insured's Retention but not for more the Insurer's Aggregate Limit of Indemnity." E.g., 2000–01 Aggregate SIR Policy at 1, Pella App. 132, ECF No. 98–6. "Payment Amounts" are defined as "[a]ll payments for damages and allocated loss adjustment expenses falling within the Insured's deductible and/or self insured retention." Id. at 2. The Insured's Retention is effectively a deductible for the Aggregate SIR Policies, and the amount varies from policy to policy. Similarly, the Insurer's Aggregate Limit of Indemnity is a cap on the amount Liberty will pay on the policy: $20,000,000 for the policies from 2000–01 to 2004–05 and $40,000,000 for the policies thereafter. The Aggregate SIR Policies do not define the terms "damages," "allocated loss adjustment expenses," or "self insured retention."

## B. Issue Preclusion

Regarding defense costs, Pella first argues that this Court already interpreted the CGL Policies to command joint and several allocation of defense costs during previous litigation between the parties, Liberty Mutual Insurance Co. v. Pella Corp., 4:07–cv–00508–JEG–TJS (S.D. Iowa) (the Prior Coverage Action). Pella interprets the following statement from an order in the Prior Coverage Action dated June 30, 2009 (the June 2009 Order), as a determination that the CGL Policies prescribe all-sums allocation for defense costs: "Liberty Mutual's duty to reimburse defense costs is triggered when Pella's defense expenditures exceed the 'Self–Insured Amount' set forth in any of the Policies." Liberty Mut. Ins. Co. v. Pella Corp., 631 F.Supp.2d 1125, 1136 (S.D. Iowa 2009), aff'd, 650 F.3d 1161 (8th Cir. 2011);

---

**3.** All citations to the 2000–01 CGL Policy apply equally to corresponding provisions in the other CGL Policies unless otherwise noted.

see also id. at 1137 ("[T]he Court holds that Liberty Mutual's duty to reimburse Pella's defense costs under the Policies is triggered once those costs are in excess of the 'Self–Insured Amount' set forth in the Declarations in any of the respective Policies."). Liberty argues that the June 2009 Order simply clarified the scope of the duty to reimburse defense costs and said nothing about allocation.

■■■■ State law governs the application of issue preclusion in diversity actions. Liberty Mut. Ins. Co. v. FAG Bearings Corp., 335 F.3d 752, 758 (8th Cir. 2003). Application of issue preclusion requires the party asserting the doctrine to prove the following:

> (1) the issue concluded must be identical; (2) the issue must have been raised and litigated in the prior action; (3) the issue must have been material and relevant to the disposition of the prior action; and (4) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment.

Westendorf v. Wehling, 611 N.W.2d 512, 514 (Iowa 2000).

Issue preclusion is not appropriate on the issue of allocation. Though the Prior Coverage Action involved the same parties, similar claims, and overlapping insurance policies and underlying claims (i.e., the Pappas Claim), the highlighted statements from the June 2009 Order lack the breadth that Pella seeks to attribute to

them. This Court was simply observing that Liberty owed no duty to reimburse an insured for defense costs until the SIR for any applicable policy was exceeded. Allocation was simply not a focus of that litigation.[4]

## C. Arguments on Method of Allocation

Turning to the language of the CGL Policies, which ultimately governs this Court's analysis, Pella argues that the CGL Policies provide coverage on a per-occurrence basis. Pella argues that pro rata allocation would mean that each CGL Policy limits Liberty's coverage obligations to a prorated portion of Pella's covered expenses. To apply pro rata allocation, Pella argues, would be to read a limitation into the policy that is absent from its text.

Pella also argues that decisions of the Iowa Supreme Court about the scope of an insurer's duty to defend inform the interpretation of the CGL Policies on the issue of allocation. Employers Mutual Casualty Co. v. Cedar Rapids Television Co., 552 N.W.2d 639 (Iowa 1996), holds that an insurer who is obligated to pay for the costs of defending an action must pay all costs incurred to defend the action, even where the action in part demands damages that would not be covered under the policy. Id. at 641; accord A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am., 475 N.W.2d 607, 627 (Iowa 1991) (en banc) ("[T]he duty to defend is broader than the duty to indemnify."). While the CGL Poli-

---

**4.** Even if this Court were to consider the statements in the June 2009 Order to have ruled on the question of allocation, good cause would exist to revisit that determination on these Motions. The Motions here squarely address the allocation issue, with Pella and Liberty each providing lengthy arguments regarding the content of Iowa law and the law of other jurisdictions. Both the briefing in the Prior Coverage Action and the Court's discussion in the June 2009 Order lacked any significant consideration of either. Additionally, a

ruling from this Court may constitute one out of only two opinions from *any* court applying Iowa law to an insurance policy regarding the method of allocation. The Restatement (Second) of Judgments allows for relitigation of issues where "[t]here is a clear and convincing need for a new determination of the issue ... because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves in the initial action." Restatement (Second) of Judgments § 28(5) (1982).

cies do not impose a duty to defend, they do impose a duty to pay defense costs. Pella reasons that it would be illogical not to allow an insured to allocate its entire defense costs to one policy because each policy is supposed to cover an insured's entire defense. Pella points out that at least one jurisdiction that applies pro rata allocation to indemnity payments applies all-sums allocation to defense costs. See Wooddale Builders, Inc. v. Md. Cas. Co., 722 N.W.2d 283, 302 (Minn. 2006).

With respect to indemnity, Pella argues that the plain language of the CGL Policies compels the conclusion that all-sums allocation is proper. To Pella, the Non–Cumulation Provision is the key. The Non–Cumulation Provision, also referred to as an "antistacking" provision, is meant to prohibit the "stacking" of multiple policy limits where a single occurrence triggers numerous policies. Pella says this provision only makes sense if one assumes that the insured can allocate all covered losses to one policy out of multiple; otherwise there would be no occasion to 'stack' policy limits. According to Pella, every published decision to consider the question has held that a Non–Cumulation Provision goes hand-in-hand with the all-sums approach.

Pella also argues that other policy provisions support application of the all-sums approach. The CGL Policies obligate Liberty to pay amounts exceeding the policy's SIR that Pella "becomes legally obligated to pay as damages because of bodily injury or property damage to which this excess insurance applies." E.g., 2000–01 CGL Policy at 35. Pella argues that A.Y. McDonald enshrined a broad view of what it means for costs to be incurred "because of" property damage under Iowa law, so that each

CGL Policy covers the full amount of indemnity payments for an occurrence that occurred in part (but not entirely) during the policy period. Pella also argues that the following provisions reflect an understanding that each individual CGL Policy covers all covered expenses arising from an occurrence, even those outside the policy period:

- "Damages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury." 2000–01 CGL Policy at 35.
- " 'Property damage' means: Physical injury to tangible property, including all resulting loss of use to that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it." 2000–01 CGL Policy at 54.
- "[T]he Each Occurrence Limit is the most we will pay for damage under Coverage A because of all 'bodily injury' and 'property damage' arising out of any one 'occurrence.' " 2000–01 CGL Policy at 44.

Liberty refers to the unreported decision of the Iowa District Court in MidAmerican as it argues that pro rata allocation is appropriate. MidAmerican is the only authority on allocation from any Iowa court that either party identifies; that district court applied the pro rata approach. Lacking any applicable Iowa law itself, the MidAmerican court surveyed other jurisdictions and found their conclusions "virtually split" but in agreement that the method of allocation analysis should start with the language of the policies in question. MidAmerican, slip op. at 4.[5] The MidAmer-

---

5. Because the Iowa district court in MidAmerican was interpreting specific insurance policies, it did not set forth pronouncements on Iowa law beyond this general point. Similarly, there is no indication that the Eighth

Circuit in Diocese of Winona v. Interstate Fire & Casualty Co., 89 F.3d 1386 (8th Cir. 1996), meant to impose any circuit-wide preference for a particular allocation approach while explicitly applying Minnesota law. See id. at

ican district court focused on four particular provisions in those policies:

- the requirement that the insurer "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of [property damage] to which this insurance applies";
- the insurer's obligation "to indemnify the insured for ultimate net loss in excess of the retained limits hereinafter stated," where " 'ultimate net loss' as used in th[e] policy, shall mean the sum actually paid in cash in the settlement or satisfaction of losses for which the insured is liable";
- the definition of "occurrence," meaning "either an accident happening during the policy period or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to or destruction to property during the policy period"; and
- a reservation in the coverage provision that "[t]his policy applies only to occurrences or accidents which happen during the policy period."

Id., slip op. at 5–6 (quoting policy language at issue in that case). The plaintiff emphasized the former two provisions requiring payment of "all sums" and the "ultimate net loss," and the defendants emphasized the provisions tying the occurrence to the policy period. Id. slip op. at 6. The district court held that the phrases "all sums" and "ultimate net loss" had no "magical significance" when interpreting the policy as a whole: those phrases just set forth the insurer's payment obligations subject to the policies' other limitations. Id. slip op.

at 7. The MidAmerican court read the provisions including the language "during the policy period" to dictate that each individual policy only covers the portion of damage caused by an occurrence that takes place during the policy period where an occurrence causes damage during multiple policy periods. Id. slip op. at 7–8 ("[A]ny indemnification called for under these policies was tied inextricably to the damage for which such payments were made having occurred during the period in which the policies were in effect."). The district court found that any alternative interpretation would be unreasonable. Id. slip op. at 8–9.

Liberty argues that the CGL Policies at issue here provide a stronger basis for pro rata allocation than did the policies in MidAmerican. The CGL Policies provide that Liberty will pay "those sums ... that the insured becomes legally obligated to pay ... to which this excess insurance applies." 2000–01 CGL Policy at 35. Liberty argues that "those sums" sets forth a narrower standard than "all sums," as used in the policies in MidAmerican, and that courts in other jurisdictions have required pro rata allocation on policies bearing "those sums" language while using the all-sums approach when "all sums" language is present. Liberty points out that the CGL Policies here, similar to the policies in MidAmerican, specifically only apply to " 'bodily injury' and 'property damage' that occurs during the policy period." 2000–01 CGL Policy at 35. Liberty distinguishes certain cases from other states cited by Pella by observing that in those cases, unlike here, the policies included provisions that allowed the policies to cover

---

1396. To the extent Liberty argues that Iowa law mandates pro rata allocation for *all* insurance contracts regardless of their policy language, such a directive would be plainly inconsistent with fundamental principles governing insurance contract interpretation. Boelman, 826 N.W.2d at 501 ("Interpretation requires us to give meaning to contractual words in the policy.").

damage occurring outside the policy period.

Pella, meanwhile, distinguishes MidAmerican by noting that the district court said nothing about non-cumulation provisions (which in Pella's view compel all-sums allocation). The policies in MidAmerican also include within the definition of the term "occurrence" the limiting phrase "during the policy period," which is not present in the CGL Policies here. Similarly, Pella finds no difference between the terms "those sums" and "all sums," as plenty of courts have applied all-sums allocation to policies containing the words "those sums."

Liberty also argues that the Non–Cumulation Provisions in the CGL Policies actually support pro rata allocation. According to Liberty, the Non–Cumulation Provisions ensure that one per-occurrence limit applies regardless of the number of policy periods triggered by an occurrence. Liberty argues that this limitation would serve no purpose if all damages attributable to an occurrence stretching across multiple policy periods could be allocated to a single policy period.

In response to Pella's other arguments, Liberty largely argues that Pella mischaracterizes the relevant case law. Similarly, Liberty points out that the Iowa Supreme Court authority cited by Pella did not discuss allocation across policies. Regarding the CGL Policies' provisions concerning the scope of coverage for bodily injury and property damage, Liberty counters that those provisions still require that the "bodily injury" occur during the relevant policy period but include subsequent damages for "care, loss of services or death" arising from that original bodily injury; and either way, the policy is clear that costs resulting from both property damage and bodily injury must take place during the policy period to be covered.

Liberty also argues that there is no reason to treat defense costs differently than indemnity payments for allocation purposes. Even Pella's out of state authority, it argues, generally allow for pro rata allocation of defense costs. Moreover, Liberty argues that principles underlying the (broader) duty to defend do not apply because the CGL Policies only require Liberty to reimburse defense costs, an obligation separate from the duty to defend.

Finally, Liberty argues that the Aggregate SIR Policies require pro rata allocation of defense costs even if the all-sums approach applies to defense costs under the CGL Policies. The Aggregate SIR Policies contain no "all sums" or "those sums" language and treat indemnity and defense costs identically, so if under the CGL Policies defense costs are allocated differently than indemnity payments,[6] that would not be the case under the Aggregate SIR Policies, according to Liberty. In response, Pella argues that the Aggregate SIR Policies contain virtually no terms and incorporate the provisions of the CGL Policies; thus, the allocation method of the CGL Policies must dictate allocation for the Aggregate SIR Policies.

### D. Interpretation of the CGL Policies

In considering the arguments put forth on the method of allocation, this Court lacks controlling authority. Judge Huppert's opinion in MidAmerican, though well-crafted and persuasive, is of only modest value in predicting how the Iowa Supreme Court would rule. There also does not appear to be a clear dominant approach among the other states. See MidAmerican, slip op. at 4 (citing Boston Gas Co. v. Century Indem. Co., 454 Mass. 337,

---

6. As noted above, Pella argues in the alternative that defense costs may be subject to all-sums allocation even where indemnity payments are allocated on a pro rata basis.

910 N.E.2d 290, 302 (2009) (adopting pro rata allocation), and Plastics Eng'g Co. v. Liberty Mut. Ins. Co. (PLENCO), 315 Wis.2d 556, 759 N.W.2d 613, 625 (2009) (adopting all-sums allocation)). The variation in the case law may result not only from different legal approaches but also from variation in the underlying insurance contracts. After all, "[w]hat the cases generally agree upon is where the court's analysis should start—the language used by the policies in question." MidAmerican, slip op. at 4 (citing Consol. Edison Co. of N.Y. v. Allstate Ins. Co., 98 N.Y.2d 208, 746 N.Y.S.2d 622, 774 N.E.2d 687, 693 (2002)); see also Boston Gas, 910 N.E.2d at 304–05; PLENCO, 759 N.W.2d at 619–21. Therefore, it would be incorrect to state that any given jurisdiction has a blanket approach for allocation for all policies. Though liability policies such as the CGL Policies may be similar to one another, policies may materially differ from case to case. Thus, this Court concludes its analysis should focus on the specific language used in the CGL Policies.

There appear to be three primary inflection points in the text of the CGL Policies: (1) the use of "those sums" in the coverage provision; (2) the temporal limitation within the coverage provision stating that "[t]his insurance applies only to 'bodily injury' and 'property damage' which occurs during the policy period"; and (3) the Non–Cumulation Provisions.

*"Those sums."* There is an inherent awkwardness in advocating "all sums" allocation when the insurance policies at issue do not include those words. But a policy can dictate joint and several liability among successive policies in any number of ways. Thus, some courts have applied all-sums allocation to insurance policies not containing that language. See Norfolk S. Ry. Co. v. Gee Co., No. 02 CH 19768, slip op. at 4 (Ill. Cir. Ct. Cook Cty. Jan. 7, 2005); State Farm Fire & Cas. Co. v. Anthony J. Cefali Tr. No. 1, Cause No. 45D04–0507–PL–00030, slip op. at 10–11, 2007 WL 1152987 (Ind. Super. Ct. Lake Cty. Jan. 25, 2007).[7] However, other courts have attached significance to the use of "those sums" rather than "all sums." Manor Care, Inc. v. First Specialty Ins. Corp., No. 3:03CV7186, 2006 WL 2010782, at *5 (N.D. Ohio July 17, 2006).[8] There does not appear to be a clear trend in the case law on whether this distinction matters. Nor is it clear that it should matter. Both "those" and "all" are used in these coverage provisions as a term that merely refers to the actual limi-

7. Other cases cited by Pella for this proposition do not provide clear support. In Aerojet–General Corp. v. Transport Indemnity Co., 17 Cal.4th 38, 70 Cal.Rptr.2d 118, 948 P.2d 909, 919–20 (1997), the California Supreme Court uses the phrase "those sums" as synonymous with "all sums" in its own prose but does not actually quote the policies at issue. In Polygon Northwest Co. v. American National Fire Insurance Co., 143 Wash.App. 753, 189 P.3d 777, 788–90 (2008), the policies in question were excess policies, not primary insurance policies, and the relevant legal question concerned the allocation of costs against primary and excess policies covering the same policy year. The district court in Manor Care, Inc. v. Continental Insurance Co., No. Civ.A. 01-CV-2524, 2003 WL 22436225, at *1, *5, *9 (E.D. Pa. Oct. 27, 2003), while recognizing that Pennsylvania generally allowed for all-sums allocation, applied pro rata allocation under Maryland law and did not analyze the significance of the "those sums" language.

8. Other cases cited by Liberty do observe a difference between "those sums" and "all sums," but as discussed in further detail below, those cases base their pro-rata holdings primarily on the presence of a temporal coverage limitation, not on the use of "those." See Trinity Homes LLC v. Ohio Cas. Ins. Co., 864 F.Supp.2d 744, 759 (S.D. Ind. 2012); Irving Materials, Inc. v. Zurich Am. Ins. Co., No. 1:30-CV-361-SEB-JPG, 2007 WL 1035098, at *22 (S.D. Ind. Mar. 30, 2007); Stryker Corp. v. Nat'l. Union Fire Ins. Co. of Pittsburgh, Pa., No. 4:01-CV-157, 2005 WL 1610663, at *6–7 (W.D. Mich. July 1, 2005).

tations on which "sums" are covered by the insurance. See MidAmerican, slip op. at 7 ("[The phrases 'all sums' and 'ultimate net loss'] merely connote what the respective insurers are obligated to pay 'subject to the limitations, conditions and other terms of the policy.'"). Though the word "those" might imply a greater degree of particularity than the word "all," upon review of applicable authority, this distinction alone does not suffice to weigh noticeably in favor of Liberty's interpretation.

*"During the policy period."* As stated in the first sentence of the coverage provision, Liberty has assumed an obligation to pay "those sums . . . that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this excess insurance applies." 2000–01 CGL Policy at 35. The CGL Policies then state a few sentences later that "[t]his insurance applies only to 'bodily injury' and 'property damage' which occurs during the policy period." Id. This provision clearly imposes some sort of temporal limitation on coverage, just as the requirement that damages be caused by an occurrence imposes a limitation on the type of damages or costs covered. The natural implication of this statement is that an individual CGL Policy does not provide coverage for injuries or damage caused by an occurrence outside the policy period, even if the occurrence causes injuries or damage both inside the policy period and outside of it. The plain meaning of this provision thus weighs heavily in favor of pro rata application, a method that attempts—however imprecisely—to allocate damages attributable to one occurrence across policy periods.

Much of the case law adopting pro rata allocation relies on provisions similar to this one. In MidAmerican, for example, the court's ultimate holding rested on a limitation that "[t]his policy applies only to occurrences or accidents which happen during the policy period." MidAmerican, slip op. at 7–8; see also, e.g., Boston Gas, 910 N.E.2d at 306–07. The definition of "occurrence" in that case also included "during the policy period" language. MidAmerican, slip op. at 6. In another case, the Southern District of Indiana distinguished an Indiana Supreme Court case adopting all-sums allocation because the instant policy before the federal district court specified that the insurance only applied to "'bodily injury' or 'property damage' [that] occurs during the policy period." Trinity Homes LLC v. Ohio Cas. Ins. Co., 864 F.Supp.2d 744, 759 (S.D. Ind. 2012); see also Irving Materials, Inc. v. Zurich Am. Ins. Co., No. 1:30-CV-361-SEB-JPG, 2008 WL 687126, at *4–5 (S.D. Ind. Mar. 10, 2008) (making the same distinction). In Stryker Corp. v. National Union Fire Insurance Co. of Pittsburgh, No. 4:01-CV-157, 2005 WL 1610663 (W.D. Mich. July 1, 2005), the Western District of Michigan, applying pro rata allocation, distinguished a Michigan state court opinion applying all-sums allocation to a policy that explicitly provided for coverage continuing beyond the policy period. Id. at *6–7. The policy in Stryker only applied to "Bodily Injury . . . that takes place during the Policy Period." Id. at *4. The policy in Dow Corning Corp. v. Continental Casualty Co., 1999 WL 33435067, at *7 (Mich. Ct. App. Oct. 12, 1999), distinguished in Stryker, stated that "[i]n the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy, The Company will continue to protect the Insured for liability in respect of such personal injury or property damage without payment of additional premium." Meanwhile, other cases applying all-sums allocation involved insurance policies that apparently lacked this explicit temporal limitation in the coverage provision. In State v. Continental Insurance Co., 55

Cal.4th 186, 145 Cal.Rptr.3d 1, 281 P.3d 1000, 1007–08 (2012), the California Supreme Court observed that "the 'during the policy period' language that the insurers rely on to limit coverage, does not appear in the 'Insuring Agreement' section of the policy and therefore is neither 'logically [n]or grammatically related to the all sums language in the insuring agreement.'" The temporal limitation contained in the Insuring Agreement of these CGL Policies (the indemnity coverage provision), by contrast, informs which sums are covered by the policies.

Pella attempts to distinguish MidAmerican on the grounds that the policies in MidAmerican contained a temporal limitation within the definition of occurrence itself. But the MidAmerican district court noted that other provisions "link the required 'occurrence' to the time period that the policy is in effect." MidAmerican, slip op. at 8. Those policies required that the *occurrence* take place during the policy period. Under the CGL Policies here, it does not matter when the occurrence happens, but it does matter when the damages or injuries are sustained. An additional limitation within the definition of occurrence is not necessary with respect to allocation.

Pella also argues that other provisions show an intent for each CGL Policy to cover damages from outside the policy period. The CGL Policies do cover within the concept of damages because of bodily injury "damages claimed ... for care, loss of services or death resulting at any time from the bodily injury." 2000–01 CGL Policy at 35. But this specific category of damages that transcends the temporal limitation in the coverage provision does not change the meaning of the policy as a whole. In light of the overall requirement that damage or injury occur during the policy period, through this provision the CGL Policies carve out an exception for coverage a specific type of future expense. Even here, "the bodily injury" in question must still take place during the policy period for this provision to apply.[9] Other provisions highlighted by Pella are in no way inconsistent with this temporal limitation because they incorporate the scope of coverage set forth in the coverage provision. See 2000–01 CGL Policy at 44 (setting forth the implementation of the "Each Occurrence Limit").[10]

Pella also points to a statement by Liberty claims handler Julian Savoie that "there is no cost sharing provision in the policy." Pella App. 4756, ECF No. 173–30. But contract interpretation is a question of law for the Court "unless it depends on extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence." Connie's Constr. Co. v. Fireman's Fund Ins. Co., 227 N.W.2d 207, 210 (Iowa

**9.** Similarly, the language "[a]ll such loss of use shall be deemed to occur at the time of the physical injury that caused it," 2000–01 CGL Policy at 54, is not relevant to the allocation issues presented by most of the Sample Claims. Here, the problem is that the property damage took place during multiple policy periods rather than one discrete damage-causing event that happened during one period but caused loss of use extending into the future. The Padovano Claim provides an example where the bodily injury clearly happened within one policy period, and there is no dispute about which policy applies to that claim.

**10.** Pella argues that the coverage obligation for damages "because of" bodily injury or property damage means that the CGL Policies cover damages for injuries taking place outside of the coverage period pursuant to A.Y. McDonald, 475 N.W.2d at 615–16, which concerned the scope of the term "damages" as used in the coverage provision. A.Y. McDonald did not concern allocation of covered costs among policy years, nor does the principle set forth in its holding compel any conclusions about how to allocate covered damages among policy years.

1975). It is not necessary to consider extrinsic evidence unless the contract is ambiguous. In re Estate of Woodroffe, 742 N.W.2d 94, 106 (Iowa 2007); see also MidAmerican, slip op. at 9 (following Woodroffe in the face of drafting history and other testimony offered in favor of the insured's preferred interpretation). This statement should not have a material impact on the Court's ultimate decision, because if the contract is ambiguous, it should be interpreted in Pella's favor. See Boelman, 826 N.W.2d at 502. Ultimately, however, the meaning of the phrase "during the policy period" is clear and weighs heavily in favor of an interpretation that the CGL Policies call for pro rata allocation.

*The Non–Cumulation Provisions.* Pella argues that the Non–Cumulation Provisions, also known as "anti-stacking" provisions, offer a counterweight in favor of all-sums allocation.[11] Of course, the Non–Cumulation Provisions do not explicitly impose all-sums allocation. What the Provisions do is to effectively apply a single Each Occurrence Limit to all triggered policies where damages caused by a single occurrence trigger multiple Liberty CGL Policies. Otherwise, an insured may submit claims under several different policies triggered by the same occurrence and attempt to recover what is allowed under each policy's per occurrence limit. See Viking Pump, Inc. v. Century Indem. Co., 2 A.3d 76, 122 (Del. Ch. 2009) (defining "stacking"). Pella implies that stacking is only possible under all-sums allocation, and Liberty disagrees.[12]

However, a non-cumulation provision can operate to reduce an insurer's exposure on an occurrence under either allocation regime, which Pella conceded at oral argument. Such a provision is simply less likely to come into effect under pro rata allocation because a larger proportion of

---

11. For reference, the Non–Cumulation Provisions read as follows:

> If one "occurrence" causes "bodily injury," "personal injury" and/or "property damage" during this policy period and during the policy period of one or more prior and/or future policy(ies) that include(s) a general commercial liability coverage form issued to you by us, then this policy's Each Occurrence Limit will be reduced by the amount of each payment made by us under the other policy(ies) because of such "occurrence."

2000–01 CGL Policy at 11.

12. In discussing the Non–Cumulation Provisions, both parties appear to conflate the concepts of "stacking" of policy limits and all-sums allocation. Pella cites a Seventh Circuit case applying New York law, Sybron Transition Corp. v. Security Insurance of Hartford, 258 F.3d 595, 601 (7th Cir. 2001), which states that "[stacking] is antithetical to a time-on-the-risk approach." But the Non–Cumulation Provisions are *anti*-stacking provisions, so this quotation only advances Pella's argument because the Seventh Circuit's Sybron opinion happens to conflate "stacking" of policy limits and "joint and several liability"—a phrase commonly used synonymously with all-sums allocation. See id. (noting that use of the phrase "joint and several liability" as referring to stacking of policy limits is unusual). Stacking of policy limits and all-sums allocation are two separate and independent concepts.

Similarly, Liberty cites a California case, State v. Continental Insurance Co., 55 Cal.4th 186, 145 Cal.Rptr.3d 1, 281 P.3d 1000 (2012), to argue that non-cumulation provisions stand in opposition to all-sums allocation. The California Supreme Court, having already adopted all-sums allocation, discussed the lack of a non-cumulation provision in the contracts at issue: "The most significant caveat to all-sums-with-stacking indemnity allocation is that it contemplates that an insurer may avoid stacking by specifically including an 'antistacking' provision in its policy." Id., 145 Cal.Rptr.3d 1, 281 P.3d at 1009. This does not mean as Liberty implies, that inclusion of an antistacking provision would negate all-sums allocation; rather, the inclusion of a non-cumulation (anti-stacking) provision changes an "all-sums-with-stacking" contract by simply prohibiting stacking.

damages will be allocated to satisfying various policies' SIRs. Thus, any structural argument that pro rata allocation would nullify the Non–Cumulation Provisions in the CGL Policies is untenable. Depending on the situation, a non-cumulation provision would appear to do its job just fine—that job being the imposition of an aggregate per-occurrence cap across policies—regardless of allocation regime. Perhaps application of both pro rata allocation and a non-cumulation provision in the same contract might make that policy unduly stingy. But if the contract is otherwise clear, this alone cannot push the policy back into the realm of ambiguity.

In this case, the text of the Non–Cumulation Provisions reveals no intent to generally cover damages occurring outside of each policy's policy period—in contravention of the language limiting coverage to expenses for injuries suffered during the policy period—just because the Non–Cumulation Provisions reference damages occurring at other times and covered by other policies. The Non–Cumulation Provisions contemplate one occurrence causing damage during multiple policy periods as a condition precedent for application of the Provisions' limitation on coverage. The text is actually consistent with the temporal coverage limitation enshrined in the main agreement in that the Non–Cumulation Provisions' applicability requires not only damage caused during other policy years but that those years be years in which the insured purchases insurance from Liberty. See 2000–01 CGL Policy at 11 ("If one 'occurrence' causes [damage] during this policy period and during the policy period of one or more prior and/or future policy(ies) that include(s) a general commercial liability coverage form issued to you by us ...."). In other words, the Non–Cumulation Provisions only apply with respect to other damages covered in other policy years by Liberty. Given this, it would make little sense for the Non–Cu-

mulation Provisions to also serve as an expansion of coverage (negating the temporal limitation in the coverage provision) for all damages occurring at any time, regardless of insurer.

Because the text of the Non–Cumulation Provisions does not appear to contravene the CGL Policies' temporal limitation on coverage, case law from other states interpreting different policies has little persuasive value. For example, Pella emphasizes the decision of the Wisconsin Supreme Court in PLENCO. In that case, the Liberty policies at issue contained non–cumulation provisions similar to those in the CGL Policies here. See PLENCO, 759 N.W.2d at 618–19. Those provisions specified that the applicable policy limits would be reduced where "an occurrence gives rise to [covered damages] which occurs partly before and partly within the policy period" or "the same occurrence gives rise to [covered damages] which occurs partly before and partly within any annual period of this policy." Id. The Wisconsin Supreme Court took this language to mean that the non-cumulation provisions "obligate[ ] Liberty Mutual to pay for injury that occurs 'partly before and partly within the policy period.'" Id. at 626. But since the provisions assume the existence of coverage of damages occurring under different policies (and is otherwise meant to *limit* an insurer's liability), it is not clear why a non-cumulation provision would also establish coverage for those non-contemporaneous damages under the instant policy.

The opinion of the Delaware Supreme Court in Viking Pump, also cited by Pella, also deserves consideration. The Viking Pump court, applying New York law, based its all-sums determination primarily on its view of the effect of non-cumulation clauses on the structure of the policies at issue in that case. Those non-cumulation clauses were similar to those in the CGL

Policies, although not identical. Viking Pump, 2 A.3d at 121 (interpreting non-cumulation provision that read, in part, "[i]f the same occurrence gives rise to personal injury, property damage or advertising injury or damage which occurs partly before and partly within any annual period of this policy ...."). The Viking Pump court reasoned that under the non-cumulation provisions, "the plaintiff's injury is treated as indivisible and resulting from one occurrence." Id. at 123 ("[T]he inclusion of the Non–Cumulation Provisions means that an 'occurrence,' which is capable of triggering multiple policies, must nevertheless be viewed as causing only a single indivisible injury."). The court explained that pro rata allocation is inherently incompatible with the assumption of "indivisible injury" established in the non-cumulation provisions "because, by spreading costs so that each policy only pays for injuries that are assumed to have occurred during that policy's period, [pro rata allocation] treats the injury as divisible. This makes the Non–Cumulation Provision nonsensical because the clause, by its terms, cannot be applied to separate injuries." Id.

This Court declines to follow Viking Pump. The notion of a unitary, indivisible injury is simply not apparent from the text of the Non–Cumulation Provisions, in this case or in Viking Pump. As noted above, the relevant policy language in Viking Pump read as follows:

> If the same occurrence gives rise to personal injury, property damage or advertising injury or damage which occurs partly before and partly within any annual period of this policy, the each occurrence limit and the applicable aggregate limit or limits of this policy shall be reduced by the amount of each payment made by [Liberty] with respect to such occurrence.

Id. at 121. The Viking Pump court says that this language reflects the policies' un-derlying assumption of coverage for indivisible injuries in a joint and several fashion because the non-cumulation provisions apply when the "same occurrence" causes injury in multiple policies, preventing an insured from "claim[ing] a separate injury in each policy period triggered." Id. at 123. But the Viking Pump non-cumulation provisions have a "same occurrence" requirement, not a "same injury" requirement. The non-cumulation provisions in Viking Pump, just like those in the CGL Policies here, would apply perfectly well to injury or injuries across policies, whether separate and divisible or indivisible, as long as the injuries were caused by the same occurrence.

The Viking Pump court reasons that in the situation of separate, divisible injuries caused by the same occurrence, application of a non-cumulation clause to damages apportioned pro rata would "give an insurer credit for recovery for sums which the insurer's policy was never responsible, due to proration, in the first place." Id. at 123. To the Viking Pump court this is self-evidently absurd, but it is not clear why. This appears to be exactly what a non-cumulation provision is meant to do; the provision is an additional limit on an insurer's liability in situations involving multiple triggered policies. In the CGL Policies, when an insured recovers for damages caused by an occurrence in another Liberty policy, the Non–Cumulation Provision offsets that recovery in the Liberty policy at issue—a policy that, under pro rata allocation, is not responsible for the sums previously recovered under the other policy—such that Liberty is only liable up to one per-occurrence limit under all of the policies triggered by the occurrence. This mechanism of limiting liability may be more insurer-friendly than other possible alternatives, but the Non–Cumulation Provisions do not on their face purport to be symmetrical. This Court does not interpret the Non–Cumulation Provisions to grant a

right on the part of the insured to apply joint and several recovery to damages caused by occurrences that trigger multiple policies.

\* \* \*

Taking the language of the CGL Policies as a whole, this Court concludes that the Policies unambiguously provide for application of pro rata allocation where a single occurrence triggers multiple policies. See Grinnell Mut. Reinsurance Co. v. Emp'rs Mut. Cas. Co., 494 N.W.2d 690, 692 (Iowa 1993) ("An insurance policy is construed as a whole, not by its separate provisions."). This Court agrees with the Iowa District Court in MidAmerican, and anticipates the Iowa Supreme Court would as well, that the phrase "during the policy period" within the coverage provision provides by far the clearest indication regarding which method of allocation is proper. By contrast, the difference between "those sums" and "all sums" has minimal impact on the interpretation of the CGL Policies, nor do the Non-Cumulation Provisions speak clearly enough in favor of all-sums allocation to make the policies ambiguous.

### E. Treatment of Defense Costs

Pella argues that even if the CGL Policies allocate indemnity costs across policy years on a pro rata basis, all-sums allocation still applies with respect to defense costs. Defense costs are covered as part of Allocated Loss Adjustment Expense (ALAE). 2000–01 CGL Policy at 50. ALAE is covered under the CGL Policies not as part of the same Insuring Agreement coverage provision that covers damages from "bodily injury" or "property damage" in Section I, but under a separate coverage provision in Section V, as amended. The CGL Policies state that "[f]or each 'occurrence' we will reimburse the insured for 'Allocated Loss Adjustment expense' paid by or on behalf of the insured in excess of the 'self insured amount.'" 2000–01 CGL Policy at 34. The text then pro-

vides that certain limitations relating to tender/notice, appeals, and trigger requirements. (2000–01 CGL Policy at 34 (referring to Section II, paras. (5)–(6), 2000–01 CGL Policy at 41–42)) Notably, there is no language in this coverage provision that limits coverage of defense costs to those incurred during the policy period. Even though the CGL Policies treat defense costs and indemnity payments identically in many ways—in particular, they essentially work in tandem to erode the SIR applying for a given occurrence—they are not treated identically in this one respect most relevant to allocation.

At least one other court has endorsed the notion that defense costs may be allocated differently across consecutive policies compared to indemnity payments. See Wooddale, 722 N.W.2d at 302 ("[T]he allocation of defense costs in the same manner as the allocation of liability may not necessarily be the majority rule when the allocation is among consecutive rather than concurrent insurers."). But plenty of other jurisdictions have applied pro rata allocation to defense costs. E.g., Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., No. 06cv11209-NG, 2010 WL 3895172, at \*15 (D. Mass. Sept. 30, 2010) (surveying other jurisdictions). Pella also cites Iowa case law regarding the scope of the duty to defend. The duty to defend is broader than the duty to indemnify and generally covers an insured's whole defense for a given claim. See Emp'rs Mut., 552 N.W.2d at 641–42; A.Y. McDonald, 475 N.W.2d at 627. The CGL Policies here explicitly disavow a duty to defend on the part of Liberty. 2000–01 CGL Policy at 41. Nevertheless, "the duty to reimburse defense costs and the duty to defend are different but 'similar in result.'" Liberty Mut., 650 F.3d at 1170 (quoting McCuen v. Am. Cas. Co. of Reading, Pa., 946 F.2d 1401, 1407 (8th Cir. 1991)). The neutral language of the ALAE coverage provision, which neither categorically specifies joint

and several coverage of defense costs nor includes a temporal limitation as the Policies do regarding indemnity coverage, should be viewed against this backdrop of Iowa law.[13] Thus, Pella's interpretation of the CGL Policy in this respect is reasonable, and any ambiguity should be resolved in its favor.[14]

## IV. ALLOCATION PERIODS

■ Liberty also requests a declaration regarding which Liberty CGL Policies are triggered by each of the Sample Claims. Pella resists most (but not all) of Liberty's proposed allocation periods. The dispute boils down to when the alleged property damage began in certain of the underlying Sample Claims.

The basic facts regarding the underlying Sample Claims have been summarized in this Court's prior order on the parties' Motions for Partial Summary Judgment. ECF No. 222; see also Pella Corp., 221 F.Supp.3d 1107, 2016 WL 6514171, at *2–5. Relevant here are the periods when the property damage alleged in each Sample Claim initially took place, thus triggering coverage under various policies.[15] The un-

derlying complaints for the various Sample Claims generally contain little detail regarding the time period in which damage is alleged to have occurred; however, many do contain allegations about when the allegedly defective Pella products were sold or installed.

Each party submitted an expert report speaking to the question of when the alleged property damage began for each Sample Claim. Pella retained Dr. George Tsongas, an engineer and building scientist and Professor Emeritus of Mechanical Engineering for Portland State University in Portland, Oregon. Tsongas reviewed various discovery materials from the Sample Claims, including reports and photographs, some from inspections performed by Pella engineers. Tsongas concluded that where the water intrusion was alleged to have been caused by defective windows or sealant (which was generally alleged for a large number of the claims), the damage "more likely than not" would have begun after the first significant rainfall (significant meaning greater than .1 inches) following installation.[16] Liberty App. 8, ECF No. 167–3. Liberty retained William Ma-

---

13. Liberty argued at oral argument that the defense costs coverage provision merely incorporated the restrictions contained with the indemnity coverage provision, but there is no indication of this in the text.

14. Liberty also argues that the terms of the Aggregate SIR Policies are relevant to determining the method of allocation here. The Aggregate SIR Policies do treat defense costs and indemnity identically, but those agreements are simply not relevant to the method of allocation. The Aggregate SIR Policies only cover amounts paid under the SIR of the specified CGL Policies; thus, the allocation made across CGL Policies, whatever the method, will necessarily dictate the amounts allocated to any given Aggregate SIR Policy.

15. The parties agree that the *final* policy period triggered is the one during which the underlying lawsuit was filed.

16. Tsongas admittedly lacked information on when many of the products were installed. The report explicitly concedes that "[t]he product installation dates for the fourteen cases were for the most part not precisely known." Liberty App. 0011. For some of the claims, Tsongas estimated installation dates for the Pella windows based on, in descending order, actual installation dates (if available), installation month (if available), window delivery date (assuming installation to follow within one or two weeks), sale order date (assuming installation to follow within two months), window installation year, and certificate of occupancy (assuming installation preceded occupancy by two months). "Where only the installation year was known, [Tsongas] assumed that installation occurred midway, on July 1 of that year." Liberty App. 0011.

zur, a civil engineer and registered professional engineer who has served as a forensic consulting engineer in the construction industry for over 20 years. Mazur conducted forensic analyses of the Sample Claims' discovery materials and examined a variety of factors, and his report identifies his estimate as to the earliest time the alleged property damage could have occurred. Generally, Tsongas estimates that the damage alleged in the Sample Claims began earlier than Mazur does. Mazur also concludes in a few instances that the Pella windows caused no damage. Thus, Pella's proposed allocation periods generally encompass more policy years than Liberty's, because Pella estimates that the alleged property damage began at earlier dates.

Additionally, for some Sample Claims, Pella argues that defense costs are triggered differently under the CGL Policies than indemnity or damages because the nature of the defense cost obligation is different. Pella argues that this Court already found in the Prior Coverage Action that claims of water intrusion trigger Liberty's defense obligation from the date the products at issue were purchased or installed.

The chart below summarizes the parties' positions on the Liberty CGL Policy periods implicated by each of the Sample Claims:

As the above chart shows, the parties do not dispute which Liberty CGL Policies were triggered by the Eakins, Leal, Newland, Padovano, and Pappas Claims. The policy periods triggered by the remaining claims present a disputed issue of fact: when did the damage begin? Pella and Liberty disagree on the answer to that question, in large part relying on experts who used different methodologies. Tsongas's approach assumes that the windows' defects were manifest immediately, such that the windows began leaking and causing damage during the first significant rainfall following installation. Mazur's approach, by contrast, engaged in a much more complex and conservative analysis that generally led to much later estimates of the earliest possible damages. This Court cannot determine at summary judgment when damage began for these remaining ten Sample Claims, and thus the Court cannot determine as a matter of law which Liberty policies were triggered for allocation purposes.[19]

---

19. Pella appears to be broadly correct in arguing that Liberty's obligation to reimburse defense costs could potentially be triggered *before* its obligation to indemnify Pella for damages is triggered. The defense cost obligation adheres once an underlying claim "contains any allegations that arguably or potentially bring the action within the policy coverage." Liberty Mut., 650 F.3d at 1170–71. This standard is more lenient than the provision in the primary insuring agreement provision, which requires an actual "occurrence" under the facts of the case. Id. at 1171. But Pella has not moved for declaratory relief on this question; this Court will not resolve the question of whether mere possession of the windows would suffice to arguably or potentially fall within the coverage obligation for the 464 Prospect and Diamantis Claims, the Sample Claims for which Pella argues Liberty's defense costs obligation adhered in a different policy year than its indemnity obligation.

## V. CONCLUSION

Based on the foregoing, Pella's Motion for Partial Summary Judgment, ECF No. 98, must be **granted in part and denied in part**. Pella's Motion is **granted** for the reasons stated with respect to the method of allocation for defense costs and is otherwise **denied**. Liberty's Motion for Partial Summary Judgment, ECF No. 167, must be **granted in part and denied in part**. Liberty's motion is **granted** for the reasons stated with respect to the method of allocation for indemnity payments and is **denied** with respect to the method of allocation for defense costs. Liberty's Motion is **granted** with respect to the Liberty policy periods triggered by the Eakins, Leal, Newland, Padovano, and Pappas Claims; Liberty's motion is **denied** with respect to the Liberty policy periods triggered by the remaining Sample Claims. **IT IS SO ORDERED.**